IN RE the PATERNITY OF: TUKKER M.O.:

MARY L.O., Petitioner-Respondent,†

v.

TOMMY R.B., Jr., Respondent-Appellant.

Court of Appeals

*No. 93–1929. Oral argument May 10, 1994.—Decided November 30, 1994.*

(Also reported in 525 N.W.2d 793.)

†Petition to review granted.

On behalf of the respondent-appellant, there were briefs submitted by *James J. Podell* and *Carlton D. Stansbury* of *Law Offices of Podell & Podell* of Milwau-

kee and by *William W. Moir, III* of *Hayes, Neumann, Humke, Moir & Bolgert, S.C.* of Sheboygan. There was oral argument by *Carlton D. Stansbury*.

On behalf of the petitioner-respondent, there was a brief submitted by *Carl K. Buesing* and *Robert H. Halvorsen* of *Halvorsen & Buesing* of Sheboygan. There was oral argument by *Carl K. Buesing*.

Before Brown, Nettesheim and Snyder, JJ.

BROWN, J.   This is a paternity case where the evidence was that the average professional football punter's career lasts about four years. The family court ordered that seventeen percent of Tommy R.B., Jr.'s $400,000 plus football salary be paid as child support and that a major portion be allocated to a trust now to insure Tukker's future needs after Tommy's football career ends. We disagree with the family court's decision to use the percentage standards in this high-income case. We do agree with the family court that it has the authority to fund now a trust to be used to support Tukker during his minority, but disagree with the method used to fund the trust. Because the statutes do not allow family courts to order support past the child's majority, moreover, we also reverse the determination that the trust be used to pay the child's college education up to age twenty-five. We also reverse the method by which the family court set up the discretionary spending portion of the trust.

The undisputed facts are as follows. Mary L.O. bore a child, Tukker L.O., and named Tommy as the father. Tommy admitted paternity and, therefore, the sole purpose of the proceedings before the family court was to determine support. Mary, a full-time student who works part time, has custody. Tommy is a punter

443

for a National Football League team. During 1992, Tommy earned between $430,000 and $440,000. Tommy's financial manager testified at trial that the average expected career of NFL punters was 4.03 years and that Tommy's career had already exceeded that point. The record does not indicate Tommy's post-NFL career plans. Tommy has a four-year college degree in business. Before becoming a professional football punter, his postgraduation employment was in a shoe store.

Tommy asked the family court to deviate from the percentage standards requiring seventeen percent of the obligor's income to be paid for child support. He informed the family court that applying the percentage standards would result in a child support award of about $5525 per month or $66,300 a year.[1] He argued that the child does not need nearly this amount for support.

The family court issued two separate bench decisions which form the basis for this appeal. It determined that applying the seventeen percent standard was not unfair. The court then stated: "[W]e really do need to look at the way of gaining as much out of [Tommy's] income as fast as we can so that we can insure a flow of income over the lifetime of the child plus the opportunity to go to college." The family court noted that Mary requested $1500 per month to support Tukker and then awarded child support in that amount

[1] These figures set forth in Tommy's pretrial brief were calculated by him based on an anticipated 1992 income of $390,000. However, the family court later found Tommy's income to be between $430,000 and $440,000. Then, for purposes of determining Tommy's gross income, the family court permitted Tommy to first deduct any unreimbursed employee business expenses reported on his federal income tax returns.

to be paid directly to Mary, with the remaining portion of the seventeen percent going into a trust fund.[2] In its written decision, the family court articulated its purposes for the trust fund: "[I]n order to provide for a continued flow of cash for child support for a minimum 18-year period while the child . . . is a minor, and to allow for the stock piling of funds over and above the $1,500 per month child support payment . . . the Court establishes a trust for [Tukker] to be used for the ongoing support needs of the minor child and for future education of the child when he is an adult."

The family court established two components of the trust fund. The first component is a "discretionary fund" to be maintained at a balance amount of $20,000. Mary can get money from this fund solely upon her request, without prior approval from Tommy, "for child support when the $1,500 per month is not immediately forthcoming from the payor and for reasonable costs of [Tukker's] minority education."

The second component of the trust is funded from the remaining monies which "shall be invested in highly-secured, high-yield, and long-term types of securities . . . .." Withdrawal from this component of the trust can be made for "big expenses, for college tuition, etc." and "shall be made only on the input of both [Mary] and [Tommy] and upon mutual agreement." If Mary and Tommy do not agree, then withdrawal can occur by court order.

---

[2] The family court also provided that "in the future, if the sum of One Thousand Five Hundred ($1,500) Dollars paid each month to [Mary] as direct support represents more than seventeen (17%) percent of [Tommy's] gross income, child support shall be adjusted so that he pays no more than seventeen (17%) percent of his adjusted gross income."

Both Tommy and Mary are cotrustees. Mary is to provide an annual accounting of the trust to Tommy. The family court "will review and examine the trust corpus on or about the Nineteenth (19th) birthday of [Tukker] to determine what, if anything, needs to be paid to bring the child support up to date and review what is necessary for the future educational needs of the child at that time." The family court judgment further provides: "The trust shall terminate in its entirety on and no later than the twenty-fifth (25th) birthday of [Tukker] by order of the Court, or upon the earlier death of [Tukker]." Upon termination of the trust, the trust proceeds, including the interest, will revert back to Tommy.

■■■■
Tommy raises several issues regarding the child support award. Determination of appropriate child support is discretionary with the trial court. *Weidner v. W.G.N.*, 131 Wis. 2d 301, 315, 388 N.W.2d 615, 622 (1986). We will sustain a discretionary act if the trial court "(1) examined the relevant facts, (2) applied a proper standard of law, and (3) using a demonstrated rational process, reached a conclusion that a reasonable judge could reach." *See id.*

We take the unusual step of setting forth, at the outset, the fundamental disagreement between the majority on the one hand and the dissent and, apparently, the trial court on the other hand. The dispute centers upon the use of the percentage standards as they apply to the high-income payor. All sides agree that the percentage standards attempt to adjust income levels of families of different composition in order to make the child as equally well off as if there had been no divorce. All sides further agree that households are assumed to choose that bundle of

consumption goods which maximize their utility, given their total income. The sides disagree, however, about whether the bundle of goods are confined to present support. *See id.*

The majority has read and reread the primary work which culminated in the enactment of the percentage standards by the legislature. WIS. ADM. CODE CH. HSS 80, Preface. That work is by Jacques van der Gaag, *On Measuring the Cost of Children*, 4 CHILDREN & YOUTH SERVS. REV. 77 (1982) (a study done as part of the Child Support Project of the Institute for Research and Poverty, University of Wisconsin, Madison). The majority reads this work to say that the percentage standards compute the bundle of consumer goods needed for present support only. The dissent believes, however, that because the percentage standards presume a higher standard of living commensurate with higher income, the higher-income payee is entitled to left over dollars, over and above present support, because that is the way of high-income families. Thus, the dissent reasons that these left over dollars are factored into the percentage standards. The dissent would conclude that because we must presume the existence of excess monies over and above present needs, the child "owns" and has a right to the excess monies now without regard to whether the monies are actually needed for present support.

It is in the context of this primary debate that we address Tommy's initial argument concerning whether the family court misused its discretion when it established his child support obligation at seventeen percent of his gross income. Tommy contends that adherence to the percentage standards is unfair to him because Tukker's current needs are much less than seventeen percent. The family court agreed that Tukker's present

needs were much less than seventeen percent. In fact, the family court explicitly commented that "no kid needs $80,000 a year." So, the nagging question is why the family court persisted in using the percentage standards anyway.

We do not want to put words in the family court's mouth. However, we believe the bottom line in the family court's reasoning process was that the money was there to pay seventeen percent and absent some compelling reason why the seventeen percent should not be applied, Tukker is entitled to it, period. The family court not only found no compelling reasons to deviate from the percentage standards, it found reasons to stick with the standards. The family court reasoned that it was important to "provide for a continued flow of cash for child support for a minimum 18-year period while the child . . . is a minor, and to allow for the stock piling of funds over and above the $1,500 per month child support payment . . .." In other words, because of the uncertainty in Tommy's financial future, the family court felt justified in using the percentage standards to fund now the rest of Tukker's minority years.

We agree with the family court's concern about Tommy's uncertain future financial status and its determination to use Tommy's temporary high income to fund Tukker's minority years. We read the law to allow the family court to take more money from the obligor than that needed for present support in order to fund future support and we will discuss the vehicle by which family courts may do so later in this opinion. However, we disagree with the family court that it may use the percentage standards as the vehicle.

The purpose of percentage standards is to provide an evidentiary shortcut for establishing the need of the

child for support. *Weidner,* 131 Wis. 2d at 318, 388 N.W.2d at 623. The standards establish the cost of maintaining a child as an equivalent to the percentage of the family income and disposable assets that a parent shares with children in his or her custody. *Id.* We assume by this statement that the *Weidner* court was discussing the *present* need of the child. The van der Gaag article confirms for us that percentage standards measure present household utility over a given year and do not take the future into account. Thus, to use percentage standards to generate money for future support is simply not what the percentage standards were intended to do.[3] That is why the family court misused its discretion by deciding to employ them.

We reverse the use of the percentage standards in this case. Given the finding that Tukker does not need the amount provided by the percentage standards for present support, we conclude that there is no reason to use the percentage standards in this high-income case. We remand with directions that the family court establish *present* child support based upon the statutory factors outlined in § 767.51(5), STATS.

The next question is, if the percentage standards cannot be used to fund now the future support of a child when the money is presently available but may not be available in the future, then what can the family court do? The answer is a "trust." And, here we hold that

[3] In fact, van der Gaag indicated that as income goes higher, the ability to meet even advanced consumer demands becomes easier and that eventually in very high-income situations, the amount spent on household utility becomes "flatter." Jacques van der Gaag, *On Measuring the Cost of Children,* 4 CHILDREN & YOUTH SERVS. REV. 77, 91 (1982). The dissent's rationale would obligate the noncustodial parent to pay even after the flattening out.

449

while the family court was in error in using the percentage standards as the vehicle to fund a trust, the family court was right when it ruled that it had the authority to use a trust in this situation.

We hold that the paternity statutes allow the trial court, in its discretion, to create a child support trust for reasons other than to protect against a custodial parent's inability to manage money. The legislature's intent to allow trusts in paternity actions is found in § 767.475(7), STATS. This section expressly provides that "[t]he court may appoint a trustee or guardian to receive and manage money paid for the support of a minor child."

Tommy argues that this provision is designed only for those situations where the custodial parent is a spendthrift or has otherwise been shown to be a risk in handling money. However, his argument is not supported by any authority. Moreover, the unambiguous wording of the statute gives no hint that the intent is as Tommy claims. We conclude that the statute allows the family court to set up a trust in a paternity action and that it may be instituted for a purpose far broader than that argued by Tommy.

In addition, § 767.51(3), STATS., authorizes the judgment or order in a paternity case to include "any other provision directed against the appropriate party . . . concerning the duty of support . . .." Thus, the legislature has expressly recognized the family court's power, in the proper exercise of discretion, to be creative in fashioning paternity support decrees. We conclude that the family court has the option to establish a trust in a paternity case.

The next issue is whether the family court misused its discretion in determining that a trust can be used to fund now the future support needs of a child. We hold that it was not outside the realm of creative decision making to establish a trust for the purpose of funding Tukker's *future* support needs until his minority status is at an end. The statutory factors in § 767.51(5), STATS., allow the family court to consider special circumstances such as they exist here. In fact, that is why the § 767.51(5) factors are still part of the law despite the percentage standards—to be used in situations where special circumstances exist such that the percentage standards should not be used. These factors permit the family court to consider not only the needs of the child and the financial means of the parents, but the best interests of the child and any other factors which the court in each case determines are relevant to the best interests of the child. Section 767.51(5)(im), (j). This, in our opinion, includes setting aside money for the future support of the child if the money is available now but may not be available in the future. We conclude that a family court does have the power to use these factors to set aside money now for future support in the form of a trust.

Here, Tommy admitted that the career of a punter in professional football averages about four years and that he is already past that mark. The family court could well infer from the testimony that Tommy had no prospect for continuing to earn a six-figure income after his football career ended and that Tommy's future earning status was uncertain. Tommy himself advanced that proposition at trial and does not challenge this finding as clearly erroneous. We also note those portions of the record where two experts testified

about the sum of money it normally takes to support one child over eighteen years. One expert put the figure at $260,000; the other expert placed the figure at $300,000. So, the family court could well have been concerned about whether that amount of money is going to be available for the full term of Tukker's minority. The family court would be within its bounds to use the factors in § 767.51(5)(im), (j), STATS., to obtain income from the payor now to fund a trust for the future.

■

Of course, we realize that while the family court ruled that Tommy give a portion of his income to set up a trust for the future, it did not use the factors in § 767.51(5), STATS. Rather, it picked an arbitrary figure—seventeen percent of Tommy's present gross income—to fund the trust for Tukker's future needs. We reverse the establishment of the trust based on the seventeen percent figure. On remand, the family court may again use a trust to fund Tukker's future needs. In doing so, however, it should use the factors in § 767.51(5) to determine the amount both for present support and future support.

While establishing that the exact terms of a trust using these factors is for the family court, not this court, we observe that two experts in this case fixed the cost of supporting Tukker over his minority years at between $260,000 and $300,000. A trust could easily be created to fund this. While we do not, and indeed cannot, order the family court to do this, we suggest that this would be one way to meet the concerns of the family court in wanting to fund Tukker's minority years now while Tommy is still playing professional football.

Tommy also argues that the family court's creation of the trust was a misuse of discretion to the extent that it provides for Tukker's postmajority needs.[4] He challenges Mary's contention, expressly accepted by the family court, that the statutes and case law give the family court authority to create a trust providing for Tukker's postmajority education.[5]

Section 767.475(7), STATS., allows a trust to dispense money "for the support of a *minor child*." (Emphasis added.) Likewise, § 767.31, STATS., authorizes a trust to distribute monies for the "support and education of any of the *minor children*." (Emphasis added.) Both provisions pertain to the needs of the child during minority. Moreover, our supreme court has held that statutorily the family court cannot compel a parent to pay for postmajority educational support. *Bliwas v. Bliwas*, 47 Wis. 2d 635, 638, 178 N.W.2d 35, 36 (1970); *see also Resong v. Vier*, 157 Wis. 2d 382, 391, 459 N.W.2d 591, 594 (Ct. App. 1990).

---

[4] On this point, Tommy relies on *Resong v. Vier*, 157 Wis. 2d 382, 459 N.W.2d 591 (Ct. App. 1990), where the trial court deferred at the request of the obligor a portion of the payments into a trust fund for the child's anticipated future college education. We reversed the trial court and held that it was error to establish a trust for the dispensing of child support where doing so improperly stripped the custodial parent of the right to make spending decisions regarding the child's rearing and also reduced the support moneys available to the custodial parent. *Id.* at 386, 391-92, 459 N.W.2d at 592, 595. Here, the family court's judgment avoided the *Resong* problem because Mary agreed to its use of a trust.

[5] Mary also raises a waiver argument here because Tommy included a postmajority component in a pretrial proposal. However, we address this issue on the merits because Tommy was not conceding the family court's authority to do this. Rather, he was providing a working model to promote settlement.

Mary cites § 767.51(5)(e), STATS., which says that the family court may consider the "need and capacity of the child for education, including higher education." Mary posits that this statute allows the family court to order support to fund postmajority education. We do not accept Mary's proposition. We read paragraph (e) to pertain to the needs of the minor child as they relate to *preparation* for higher education and not to allow the family court to compel the parent to pay for college education. We see nothing to indicate that the legislature intended to alter the basic proposition that the law does not require parents to support their adult children. *Resong*, 157 Wis. 2d at 391, 459 N.W.2d at 594. Thus, we hold that none of the statutory provisions cited by Mary authorizes postmajority needs as a proper purpose in fixing present support.

Mary cites *Hubert v. Hubert*, 159 Wis. 2d 803, 817, 465 N.W.2d 252, 257 (Ct. App. 1990), as supporting her position that case law allows a child support trust to provide for postmajority needs. In *Hubert*, we held that the family court "does, *in limited circumstances*, [pursuant to § 767.25(2), STATS.] have the authority to establish a trust for postmajority educational needs."[6] *Id.* at 811, 465 N.W.2d at 255 (emphasis added). Mary's argument, as well as the dissent in this case, require us to discuss the *Hubert* holding in detail.

---

[6] In *Hubert v. Hubert*, 159 Wis. 2d 803, 817, 465 N.W.2d 252, 257 (Ct. App. 1990), we held that the family court could create a trust in divorce cases under § 767.25(2), STATS. Tommy argues that since this section does not apply to paternity actions, the *Hubert* holding also does not apply to the present case. Notwithstanding Tommy's contention, we address the *Hubert* holding to the extent that its reasoning generally applies to a parent's obligation to support his or her child, regardless of the child's birth circumstances.

The language in *Hubert* is so broad that reasonable minds can differ on its meaning. One alternative is to read the case narrowly and limit it to its facts so that it is consistent with *Bliwas*, 47 Wis. 2d at 638, 178 N.W.2d at 36.

In *Hubert*, the family court found that it would be unfair to apply the percentage standards in the high-income situation before it, ruling that it was absurd to continue to provide the children with the same standard of living they enjoyed during their parents' marriage. The court then based the child support on the amount that the obligor offered to pay. The family court also refused the custodial parent's request to order postmajority educational trusts, stating that it did not have the authority to do so.

On appeal, this court acknowledged that the family court may deviate from the percentage standards when their application would result in child support far beyond the child's needs. The family court deviated from the percentage standards, but the *Hubert* court held that the reasons supporting the deviation did not pass muster. This court determined that in fashioning its award, the family court paid too much attention to what the high-income parent offered to pay and no attention to the amount "the children would have had had the marriage continued." *Hubert*, 159 Wis. 2d at 815, 465 N.W.2d at 256; *see* § 767.25(1m), STATS. That is, the statutes require a consideration of the parties' standard of living.[7] *Hubert*, 159 Wis. 2d at 815, 465 N.W.2d at 256. The *Hubert* panel observed that the family court failed to consider "factors made relevant

[7] "Standard of living" means the level of subsistence and comfort in everyday life that was enjoyed by the children because of their parents' financial resources. *Hubert*, 159 Wis. 2d at 815 n.2, 465 N.W.2d at 256.

455

by the peculiarities of this case, for example, a substantial savings and investment program for the children." *Id.*

Under the facts of *Hubert*, a substantial savings and investment program was already in place and was apparently "what the children would have had had the marriage continued." *Id.* Thus, a reasonable person could read *Hubert* to hold merely that the family court could establish a trust for postmajority educational needs when a savings and investment program providing for those needs was already in place. *Hubert* can be reasonably analyzed to say that since the postmajority needs of the children were already part of the parents' criteria for supporting the children before the breakup of the marriage—and was part of the established level of support—that level, including college savings, should be continued.

The dissent, filed by a member of the panel that wrote *Hubert*, writes concerning the *true* meaning of *Hubert*. In the view of the dissent, *Hubert* stands for the following scenario. The family court first sets *present* support. Then, if the custodial parent asks that a portion of the present support be set aside in the form of a trust for college education, the custodial parent is in reality committing herself or himself to conserve resources to pay for the present support out of the monies that are not taken in by the trust. Therefore, as a hypothetical, if the custodial parent is awarded seventeen percent as *present* support, the custodial parent can then ask for a portion of the seventeen percent to be placed in a trust for the college education of the children.

Nowhere in our reading of *Hubert* have we been able to find language supporting this understanding, nor has the dissent been able to point to where the case

456

says this. Be that as it may, we accept the dissent's understanding of the meaning of *Hubert* and apply it to this case.

The dissent insists that all the family court was doing here was applying *Hubert* the way the case was meant to be interpreted. In the dissent's view, the seventeen percent was found by the court to be the amount needed for support. Once having found that the presumptive standards applied, the custodial parent asked for a portion of that money to be set aside in a trust for Tukker's postmajority educational needs.

The dissent's position, and we think the family court's position as well, fails for the same reasons we elaborated upon when discussing the use of percentage standards. Their view is that "present support" includes monies over and above existing consumer needs. They view high-income payors as having the money to pay for their children's college education. They apparently argue that savings for a college education is simply another good and, in a high-income situation, is part of what makes up "present support." The perception is that it is proper to "tack on," as part of "present" support, extra money over and above consumer needs to fund college. In their view, this is simply part of the higher standard of living that inures to those with money flexibility. In their view, it is appropriate to order the percentage standards in a high-income situation even though the standards will generate money in excess of present needs. The money is then "owned" by the child. If the custodial parent requests, the court can set a portion of this excess money aside for college.

This position finds some support in the literature. Certain commentators read *Hubert* as at least moving toward the proposition that courts may order a trust

for postmajority education, if the income is available, *over and above* the child's present needs. *See* Gregg Herman, *Relying on the Old Man's Money,* 11 WIS. J. OF FAM. L. 25, 40 (1991). Coauthors of another article have opined that the impetus for this is a father's unwillingness to continue supporting, emotionally and financially, a child's postsecondary education after a divorce. Judith S. Wallerstein & Shauna B. Corbin, *Father-Child Relationships After Divorce: Child Support and Educational Opportunity,* 20 FAM. L.Q. 109, 125 (1986). Therefore, the feeling is that if there is money flexibility to pay for the children's college educations, the family courts should be able to order it. This is because the children would then be receiving support in the same manner as if there had been no divorce.

We are convinced that the dissent and the family court share this ideal. In fact, the family court itself said that Tukker "can go to Harvard if he wants." We determine this to be an indicator that the family court was adopting the theory expressed by the commentators. If the money is there, so the theory goes, a trust to pay for college should be part of a "present" support award. In such a situation, the child would then be placed in the same position as would be the case if there were an intact marriage.

■

We do not denigrate this as a policy goal if that is what the legislature, in its wisdom, determines is appropriate. It is reasonable to believe that since we must measure child support based upon the standard of living that a child would enjoy if there were no divorce, a paid-for college education for those who can well afford it might be a good idea. However, to give our imprimatur to such a policy would mean that *Bliwas* would be overruled. It would mean that family courts

458

could use the percentage standards in high-income situations as the means to order the payment of college educations. As an error-correcting court, we should not be sanctioning unique ways to overcome *Bliwas*. If the policy goal suggested by the commentators is to be the law in this state, it should come about as a result of legislative action. While we accept the dissent's understanding of *Hubert*, we reject the idea that money flexibility to pay for college is part of "present" support for a high-income payor.

Upon remand, if the family court sets up a trust fund for the future support of Tukker, the "child" does not "own" that trust. It is money being put aside for the future, not for the present. If the trust is owned by anyone, it is jointly owned by both parents and controlled by the court. The court may not order that a portion of the trust be set aside to pay for the college education of Tukker.

Next, we address Tommy's contention that the "discretionary fund" in the amount of $20,000 is a misuse of discretion. As we mentioned, the family court established this fund "for child support when the $1,500 per month is not immediately forthcoming from the payor and for reasonable costs of [Tukker's] minority education." Mary's expenditures must be reviewed by the family court at the end of each year. Tommy seems to equate this as though it were a slush fund to be used by Mary at her whim. That is not the case. The discretionary fund can only be used when Tommy is delinquent in his payments and for minority education needs, including out-of-school endeavors such as learning a musical instrument or the like. Every year, Mary must give an accounting to the trial court. We see no misuse of discretion up to this point.

However, Tommy asserts that as a cotrustee he should have a say in how this money is spent *before* it is spent. We agree. Creation of a "discretionary fund" that authorizes different investment options than the trust, allows withdrawal from the fund by the custodial parent at the expense of the trust without cotrustee approval, and has different notice and review provisions than the trust[8] effectively creates two separate entities—a trust and a fund. As we see it, the trial court may impose a trust, but may not thereafter impose a fund that has separate components than the trust. We reverse and remand this part of the decision. If the trial court wants to, it may order that the discretionary fund exist, but that payments out of the trust be made only by mutual consent of both trustees or by order of the court.

In conclusion, we reverse the family court's finding that seventeen percent of Tommy's income is the amount of present support and direct that, upon remand, the family court determine the amount of present support. The family court may, in its discretion, take new testimony and establish present support. The family court need not be bound by the amount per month requested by the custodial parent since that is but one factor in determining support. We agree with the trial court's use of a trust to fund now for the future and leave to the family court the discretion to recreate

[8] The trial court's designation of the discretionary fund as one of two trust components is a fiction clearly exposed by the separate provisions of the court's judgment and clearly contrary to the express provision of § 767.25(2), STATS., that the court may create "a separate fund or trust for the support, education and welfare of such children." The trial court lacks authority to create both a separate fund and a trust under the statute.

the trust for future support needs if the court deems it in Tukker's best interests. We reverse the discretionary portion of the fund but leave it to the trial court to reinstate that component as part of the trust consistent with this opinion.

Costs are not awarded to either party.

*By the Court.*—Judgment affirmed in part; reversed in part and cause remanded with directions.

SNYDER, J. (*concurring*). Because this well-intended child support order attempts to deal with a present absurdity by placing the burden of avoiding a future absurdity on Tommy, I concur that the support order must be revisited.

The family court awarded $66,300 support per year using the one-child seventeen percent standard. Requiring $66,300 to meet a single child's needs for a one-year period using a mechanistic formula is absurd. No one argues that point. Tommy's future tenure in the NFL is unknown. He has already survived an NFL punter's average 4.03 years which could bode well for him. Tukker, however, does not need, nor is he entitled to, a seventeen percent vested interest in all of Tommy's future NFL contracts.

The dissent resorts to a mathematical analysis to support the trial court's order, stating that "[u]nder the family court's base support award of $18,000 per year . . . Tommy's support obligation over eighteen years will total $324,000." Dissent at 467. The family court did not set a support obligation cap of $324,000. If it had, this case would be less troublesome. Neither did the family court set a "base support award" of $18,000. That represents the amount that Mary requested for

present support and that she will receive directly out of the $66,300 annual support award.

Child support in excess of $18,000 per year goes into a trust. The child support order does not address when sufficient trust funds and support will have been paid by Tommy to meet all of Tukker's minority support needs. Because neither the support order nor the percentage standards address that concern, I would remand the case with the following observations.

First, the family economics experts testified that the total cost of Tukker's minority support needs in Sheboygan county is between $260,000 and $300,000. The dissent's suggested support obligation cap of $324,000 would therefore make sense if that was what the family court had ordered in an effort to accommodate Tommy's present NFL income. Again, that is not what the family court ordered. I read the support order to require excessive ("no kid needs $80,000 a year") annual support payments payable from now until some unknown time within the next eighteen years without any concern about how much of Tommy's money will be absorbed. I cannot read it otherwise. I take no comfort in the dissent's position that Tommy can come back and object in the future. He has already objected.

Second, Tommy's family economics expert, Susan Richards, testified that the question of the fairness of the Wisconsin percentage standards has not been adequately studied relative to incomes in excess of $60,000. She referred to a 1990 study where "98 percent of the people that they surveyed [in the study] had incomes under $60,000." Mary's family economics expert, Donald McNeely, agreed with Richards's statement that "[b]asically, there are no studies that reflect what people actually spend at the higher income levels on their children. The data simply is not available."

462

Those experts' concerns are underscored by the van der Gaag study and should not be ignored.

Third, Richards testified that Wisconsin is in the minority of percentage standards states in not having a cap or ceiling on the total amount of support that can be ordered. She stated that ten or twelve of the seventeen states that use the standards have such a limitation. A ceiling or cap incorporated into the Wisconsin percentage standards would eliminate much of the uncertainty and conjecture encountered here and in *Hubert* without doing harm to Wisconsin's adequate child support goals. Because Wisconsin's percentage standards do not provide that protection, the standards should not be used in Wisconsin high-income provider cases.

Fourth, as to the propriety of using the Wisconsin percentage standards for high-income cases, Richards testified that as income goes up, relative spending goes down and that people will not continue to consume at the seventeen percent per child level because "at each additional level of income, people tend to consume less and less of [their income]." Highlighted by the van der Gaag study as indicated in footnote three of the majority opinion, this is basic to my concerns. The lack of that single consideration being incorporated into Wisconsin's percentage standards creates an inherently unfair situation in the mechanistic application of the percentage standards to high-income provider cases.

The problem here, as in *Hubert*, is the somewhat mindless attempt to force a square peg into a round hole because we have determined that under lesser financial circumstances the square peg fits into a square hole. In doing so, we create a plethora of conjecture and speculation in high-income provider cases that defies resolve and casts doubt upon the logic and fairness of our family support laws.

463

In sum, our present percentage standards do not accommodate high-income provider cases. Without a total support obligation cap, we cannot cure the inherent absurdity of applying the percentage standards to high-income provider cases by creating innovative funds and trusts on a case-by-case basis. Nor should we try. If we embrace a formula that begets absurd results, we will continue to suffer cases like *Hubert* and Tommy without concluding much of value or utility for use by the bench and bar. The users of the Wisconsin court system deserve better.

Finally, one might read this case and conclude that unless the family court obtains a lot of Tommy's money up front, Tukker is destined to suffer economically. That conclusion would be contrary to the record and Tommy's clear willingness to provide for Tukker's needs. Tommy's contention that the child support order is unfair to him is well reasoned and he is entitled to equitable treatment in the Wisconsin court system. Unfortunately, the application of our present percentage standards to high-income provider cases frustrates that worthy goal.

NETTESHEIM, J. (*dissenting*). I disagree with the majority's holding that the family court erred by applying the Department of Health and Social Services percentage standards when fixing Tommy's support obligation. I also disagree with the majority's new theory of law which bifurcates present and future support. Finally, I disagree with the majority's holding that the family court erred by creating a trust, with the consent of the custodial parent, to receive a portion of the support payments to fund Tukker's possible future college education expenses.

464

## THE PERCENTAGE GUIDELINES

### A. The Trial Court's Exercise of Discretion

The determination of child support is committed to the discretion of the family court. *Weidner v. W.G.N.*, 131 Wis. 2d 301, 315, 388 N.W.2d 615, 622 (1986). The majority holds that the family court misused this discretion by employing the percentage standards to fix Tommy's support obligation.

I contend that the family court's decision was correct. I begin with the fundamental principle that a support order must serve the best interests of the child. Section 767.51(3), STATS.; *Weidner*, 131 Wis. 2d at 317, 388 N.W.2d at 622. As to the application of the percentage standards, we have held that "in cases where the parties have a substantial marital estate and income far beyond the average income of most people, the robotistic utilization of the percentage standards may give absurd results." *Hubert v. Hubert*, 159 Wis. 2d 803, 814, 465 N.W.2d 252, 256 (Ct. App. 1990). I contend that the family court's application of the percentage standards in this case was neither robotistic nor a misuse of discretion.

The paternity support statute provides that support may be expressed as a percentage of the parent's income. Section 767.51(4), STATS. In addition, the statute provides that the court *shall* determine child support payments by using the percentage standards established by the department. Section 767.51(4m). However, the statute permits the court to deviate from the presumptive application of the standards if the court finds by the greater weight of the credible evidence that the use of the standards is unfair to the child or to the party requesting such deviation. Section 767.51(5).

Here, the family court's use of the percentage standards was not robotistic. Instead, in a series of elaborate decisions, the court detailed why the use of the standards did not produce an unfair or absurd result to any interested party, particularly Tommy. In its role as fact finder, the court determined that Tommy had not satisfied his burden of proof to show that the presumptive application of the percentage standards would be unfair to him or Tukker. I contend that both the evidence and the law support the court's determination.

In its bench decision of February 17, 1993, when considering whether to apply the percentage standards, the family court gave a textbook example of a proper exercise of judicial discretion. In this decision, the court addressed each and every factor set out in § 767.51(5), STATS., consuming some twelve pages of the trial transcript.[1] The court considered: (1) each parent's earning capacity; (2) each parent's relative financial circumstances; (3) Tukker's needs; (4) Tukker's physical, mental and emotional health needs; (5) each parent's standard of living and economic circumstances; (6) the need and capacity of Tukker for education; (7) Tukker's age; (8) Tukker's financial resources and earning ability; (9) the physical custody arrangement; (10) any extraordinary travel expenses related to periods of physical placement; (11) the responsibility of the parties for the support of others; (12) the value of the services contributed by Mary as the custodial parent; and (13) Tukker's best interests.

---

[1] In so doing, the family court went beyond the requirements of the law. A court need consider only those factors which are relevant. *See DeLaMatter v. DeLaMatter*, 151 Wis. 2d 576, 586, 445 N.W.2d 676, 680 (Ct. App. 1989). Here, the court considered all the statutory factors, relevant or not.

While addressing these statutory factors, the court determined that Tommy had the clear ability to pay the level of support called for under the percentage standards. Tommy does not dispute this point. The family court then found that the career expectancy of a special teams NFL punter is 4.03 years. At the time of trial, Tommy's punting career had already exceeded this projection. In addition, Tommy testified that although he hoped to continue with his NFL career, he was not even under contract as of the trial. Based on this evidence, the family court correctly noted in its bench decision, "[Tommy's] future as a special teams player has limitations, and probably in the near future, he won't be doing that any more."

Based on this analysis, the family court concluded that the application of the percentage standards would not be unfair to Tommy. In the face of this detailed reasoning, the majority accuses the family court of having "picked an arbitrary figure" under the percentage standard. Majority op. at 452, 525 N.W.2d at 798. Even if wrong, the family court's detailed explanation can hardly be labeled arbitrary. Adding insult to injury, the majority does not even address the family court's reasons, much less explain why they represent a misuse of discretion. I contend that when we reverse a trial court's discretionary determination which is supported by an abundance of reasoning, we at least owe the trial court an explanation as to why those reasons fail to pass muster on appellate review.

A simple mathematical analysis of the family court's decision reveals why it makes sense. Under the family court's base support award of $18,000 per year (a figure with which neither the majority nor Tommy quarrels), Tommy's support obligation over eighteen years will total $324,000. If Tommy remains in the

NFL for two more years (an inference well allowed by the evidence) and assuming a $400,000 per year salary, Tommy would pay $136,000 of that total support obligation during this two-year period. The balance would be paid over the remaining sixteen years of Tukker's minority at a far lesser rate under the percentage standards because Tommy will be earning far less money.

For instance, if Tommy should earn $50,000 per year after his NFL career ends, he would pay support for those sixteen remaining years at the rate of $8500 per year, or a total of $136,000. Added to the same amount paid for the first two years, Tommy's total support payments would total $272,000, *a $52,000 shortfall based on Tukker's present needs.*

The family court minimized the risk of such a shortfall by simply requiring Tommy to pay a greater portion of the support obligation pursuant to the percentage standards at the present time when Tommy has greater income available, rather than at a later time when he will have less. The court's structuring of the support payments in this fashion serves the best interests of Tukker because it assures a present fund to meet his needs both now and in the future. It also is fair to Tommy because it allows him to satisfy a greater portion of his support obligation at a time when he can better afford it. This was wise, prudent and creative judging. We should respect it.

The majority, however, seizes on the family court's statement that the support award produces money beyond the average standard of living level established by the evidence. Of course it does *for the moment.* But the family court properly did not confine itself to just the immediate moment. Rather, the court also looked to the evidence regarding Tommy's future ability to

satisfy the support obligation based on Tukker's present needs.

Thus, the family court's application of the percentage standards in this *short-term*, high-income case was not robotistic and did not produce the absurd result which can sometimes result in a *long-term*, high-income situation.[2] *See Hubert*, 159 Wis. 2d at 814, 465 N.W.2d at 256. To the contrary, the application of the standards do not even assure that Tukker will receive the full amount of support to which he will be entitled over his minority even measured from his present needs. The majority deprives Tukker of the fair and proper level of support to which he is presently entitled. That loss of support can never be recovered.

If the evidentiary projections upon which the family court's support order is based prove to be faulty, Tommy's remedy is to seek modification of the judgment. The family court expressly recognized this eventuality in its decision. We should allow that process to work.

## B. Present / Future Support

In undoing the family court's support order, the majority creates a new theory of support law which draws a distinction between present and future support. Under this theory, the majority concludes that a support order may only address the immediate situation. The majority further holds that any accommodation to future events reasonably predicted by the evidence can only be addressed by a minority trust.

---

[2] As the family court aptly put it, "This is a little different than Doctor Hubert who can sit there and say, well, listen, why are you worried about the future. I am going to knock down a million dollars a year from now to the next 20 years."

On a threshold basis, I fear that the majority does not appreciate the breadth and consequence of its opinion. The majority says that "to use percentage standards to generate money for future support is simply not what the percentage standards were intended to do." Majority op. at 449, 525 N.W.2d at 797. However, the use of the percentage standards represents an "evidentiary shortcut" in lieu of the statutory factors by which the family court fixes support. *See Weidner*, 131 Wis. 2d at 317-18, 388 N.W.2d at 622-23. Thus, the majority's statement applies with equal force to all support orders whether fixed under the statutory factors or under the percentage standards. This must be borne in mind as I detail my objections to this new theory of law.

When a family court enters a support order, the expectation of all concerned (the child, the parents, the lawyers and the court) is that the order will endure into the future until circumstances change warranting a modification of the award. In short, every support order reaches into the future.

This is eloquently demonstrated by what occurred in this case. The family court's support order was premised upon Tukker's present needs and the legitimate assumption that such needs would continue into the future unless or until a change in circumstances demonstrated otherwise. Now, however, the majority grafts onto this procedure its new theory which invalidates the "future" aspects of this support order.

The majority theory raises a host of troubling questions. The most obvious is, when does the "present" end and the "future" begin? I contend that the family court's discretionary authority to set appropriate support, coupled with the law of support order

modification, provides an efficient vehicle for addressing these concerns.

Equally disturbing is the majority's holding that the "future" component of a support order (whatever that is) can only be addressed by the cumbersome procedure of a minority trust. Since nearly all support orders have a futuristic reach, such trusts will now become routine (perhaps even mandatory) under the majority opinion.[3] And in the process, the custodial parent is stripped of the right to direct control over support moneys. *See Resong v. Vier*, 157 Wis. 2d 382, 391-92, 459 N.W.2d 591, 595 (Ct. App. 1990). Instead, the majority sends the custodial parent off to a trustee to plead for release of support moneys.

Finally, since the family court may now order support only to meet the immediate needs of the child, the already overburdened family courts of this state will find themselves besieged with repeated motions for modification of support awards seeking to update existing support orders. I contend that our existing law which envisions future application of a present support order, coupled with the law of support order modification, efficiently addresses the majority's concern. We should not substitute this very workable system with the majority's new approach.

In conclusion, I contend that the distinction drawn by the majority is a phantom in the real world of sup-

---

[3] As with the entire law of support, the creation of a trust is committed to the discretion of the family court. *See Hubert v. Hubert*, 159 Wis. 2d 803, 817, 465 N.W.2d 252, 257 (Ct. App. 1990). By holding that the "future" component of a support order can only be accommodated by a minority trust, the court *must* use a trust even if the court is well satisfied that the custodial parent would be an efficient and responsible manager of the support money.

port law. Moreover, the majority's theory and the procedure it imposes on litigants and the judicial system are unnecessary, burdensome and unworkable.

## C. *Tukker's Standard of Living*

Another erroneous premise of the majority opinion is its holding that the percentage standards do not accommodate a higher standard of living for a child commensurate with a higher income of the payor. The error of the majority's thinking is self-evident from the standards themselves: as the level of income increases, so does the level of support. Obviously, a higher level of support will ordinarily produce a concomitant higher standard of living for the child. This alone refutes the majority's theory.

In addition, I again recall that the percentage standards are but an evidentiary shortcut for the application of the statutory factors. *See Weidner*, 131 Wis. 2d at 317-18, 388 N.W.2d at 622-23. Thus, the percentage standards already subsume the statutory standard of living factor. The majority writes this factor out of the standards.

The law requires a family court to consider the appropriate standard of living when making a support award, and the family court in this case complied. Based on Mary's testimony and certain expert testimony regarding the needs of an average child in Sheboygan County, the family court found that Tukker's current needs could be met by a base support order of $1500 per month, or $18,000 per year. As noted, Tommy did not dispute this amount. However, the family court also observed that merely satisfying Tukker's subsistence needs was not the only relevant factor when fixing Tommy's support obligation. As noted earlier, the court proceeded to address all of the

statutory factors set out in § 767.51(5), STATS., including Tukker's standard of living.

In *Hubert*, the court of appeals rejected the theme sounded by the majority that such a consideration is off limits:

> The [family] court's ruling that it would be absurd to continue to provide the children with the same standard of living they enjoyed during the marriage was error. It ignores the statutory directive that the court consider what the children would have had had the marriage continued. Section 767.25(1m)(c), Stats.

*Hubert*, 159 Wis. 2d at 815, 465 N.W.2d at 256 (footnote omitted).

Standard of living means the level of subsistence and comfort in everyday life that was enjoyed by the children because of their parents' financial resources. *Id.* at 815 n.2, 465 N.W.2d at 256. Here, of course, the realities of a paternity case set in. Because Tukker is a nonmarital infant in a paternity proceeding, he was unable to present direct evidence of an established family standard of living pattern.[4] However, the family court properly did not penalize Tukker because of this status. Instead, the court analyzed the evidence bearing upon the parties' total economic circumstances. From this, the family court logically concluded that Mary and Tommy, as responsible parents, would have maintained Tukker at a standard of living commensurate with Tommy's substantial income.

The majority ignores the family court's reasoning on this point. Instead, the majority focuses on Mary's

---

[4] The only standard of living history was that Mary and Tukker had lived in low-income housing and had been maintained by AFDC payments.

modest standard of living testimony and the expert testimony regarding the average cost to rear an ordinary child in Sheboygan County. By measuring Tukker's support only from this narrow and limited perspective, the majority treats Tommy as if he was still working in a shoe factory instead of kicking footballs for an NFL team. Instead of judging this case on its particular facts, the majority instead employs a theory of "socialized support" which reduces Tukker's standard of living level to a theoretical average or common denominator. This approach has no basis in law or common sense.

## D. Conclusion

I view the family court's support order as the product of precisely what the law requires—judicial consideration of Tukker's best interests during his minority based on his needs and likely standard of living measured against his parents' ability to satisfy those considerations. Based on its consideration of all the statutory factors, the family court concluded that the amount of support provided under the percentage standards was not unfair to any party. Even though the family court ultimately applied the standards, the thoroughness of the family court's opinion demonstrates that the court did not take the "evidentiary shortcut" which the guidelines envision and permit. *See Weidner*, 131 Wis. 2d at 318, 388 N.W.2d at 623. Instead, the family court has provided us and the parties with a decision which, in my judgment, withstands appellate review be it under the guidelines or under the statutory factors.

In light of the family court's thoroughness, the majority understandably cannot label the court's decision "robotistic" in contravention of *Hubert*, 159 Wis.

2d at 814, 465 N.W.2d at 256. Instead, the majority is forced to find a different way to reverse. Its answer is to create a new legal creature which draws an impractical and artificial distinction between present and future support.

As previously noted, if the evidentiary projections upon which the family court premised the support order prove to be faulty, Tommy's remedy is to seek modification of the judgment. The majority short circuits this orderly process. Instead, from this lofty perch, the majority now micromanages the support aspects of this case into the future. This is not our function. We should leave any necessary support adjustments in this case to the family court based upon any changes in circumstances as they occur.

## THE TRUST

Having concluded that the family court's support order was a proper exercise of discretion pursuant to the paternity support statute, I now address the majority opinion's further holding that the family court erred by creating a trust fund to receive a portion of the support payments.

The majority jettisons the trust in this case based on its mistaken belief that the family court improperly imposed a postmajority support obligation on Tommy. As I have already explained, this is not what the family court did. Instead, the court determined the appropriate level of Tukker's support based on his present needs projected over the duration of his minority. The court's support order does not require Tommy to expend one dime beyond Tukker's eighteenth birthday. Nor does the order accidentally or intentionally camouflage a postmajority support obligation against Tommy.

Having correctly fixed Tommy's support obligation, the family court then considered the parties' pretrial proposals to segregate a portion of the present support in a trust fund to meet Tukker's possible college education expenses. In so doing, the court correctly followed the law. Absent the consent of the custodial parent, the judicial imposition of a trust which diverts present support money to a trust fund to cover the anticipated costs of postmajority education is improper because it deprives the custodial parent of the *present* right to receive support money and to make the discretionary decisions as to how that money is to be spent for the child. *See Resong*, 157 Wis. 2d at 391-92, 459 N.W.2d at 595. Here, however, Mary has consented to the diversion of a portion of the present support money into a trust fund to meet Tukker's possible postmajority educational expenses. Therefore, the court's trust did not run afoul of *Resong*.

Here again, the *Hubert* case comes into play. There, the custodial parent asked the trial court to divert a portion of the presently ordered support into a trust fund to meet the postmajority educational needs of the children. The family court rejected this request, holding that it had no authority to order a payor to support a child beyond the age of majority. The *Hubert* court reversed, saying, "[§ 767.25(2), STATS.,] gives the court an attractive means of providing for the future educational needs of children *with child support that is paid while the children are under the age of majority.*" *Hubert*, 159 Wis. 2d at 817, 465 N.W.2d at 257 (emphasis added).

Although the majority sees ambiguity in this language, it correctly interprets *Hubert* to say that support money which is paid while the children are

476

under the age of majority may be diverted into a college trust fund with the consent of the custodial parent.

Thus, *Resong* and *Hubert* rest comfortably with each other. In both cases, moneys earmarked for present support were proposed to a trust for postmajority education expenses. In *Resong*, the effort was doomed because the custodial parent did not consent to the diversion of the funds. In *Hubert*, the request was proper because the custodial parent did consent. This case obviously falls under *Hubert* because Mary has consented to the trust.

In summary, the creation of such a trust is proper where: (1) the custodial parent agrees to invest a portion of presently needed support into a prudent investment program to meet a postmajority need of the child, (2) such is in the best interests of the child, and (3) such is approved by the family court.[5]

Because the family court properly determined Tukker's support pursuant to the paternity support statute, the court was free, with Mary's consent, to divert a portion of those moneys to a trust fund to meet Tukker's potential postmajority education expenses. I

---

[5] The majority also uses § 767.51(5)(e), STATS., to undo the trust in this case. This statute allows the family court to consider, inter alia, the "need and capacity of the child for education, including higher education" when fixing support. The majority agrees that this language contemplates "preparation for higher education." Majority op. at 454, 525 N.W.2d at 799. But in its next breath, the majority holds that this does not include financial preparation. Common sense would dictate that financial preparation is one of the most important planning ingredients for higher education.

Again, I would hold that if the funds proposed for the postmajority education of the child come from moneys which otherwise would be properly applied to current support, then neither § 767.51(5)(e), STATS., nor any other law is violated.

respectfully dissent from the majority's opinion which reverses the court's discretionary decision to create such a trust.

## CONCLUSION

I conclude by addressing the incongruities resulting from the majority opinion. First, the majority invalidates the trust created with the consent of Mary. Yet nothing bars Mary from creating such a trust on her own.

Second, the trust created by the family court assured that the bulk of the support would be preserved for Tukker under judicial control and supervision. Since the majority invalidates the trust, that assurance is now lost. While I have no reason to doubt Mary's good intentions, I much preferred the certainty of the trust created by the family court.

Third, the trust created by the family court named Tommy and Mary as cotrustees with authority to make joint expenditure decisions.[6] I cannot recall a case where the noncustodial support payor had been granted such a prominent role regarding the expenditure of support money. That privilege and opportunity are now lost to Tommy under the majority opinion.

Fourth, the trust created by the family court directed the return of the remaining trust assets to Tommy: (1) at Tukker's nineteenth birthday if Tukker should not pursue a college education and, in any event; (2) at Tukker's twenty-fifth birthday.[7] By prevailing on this appeal, Tommy has now lost this

---

[6] If Tommy and Mary could not agree as to expenditures, the trust provided that the family court would resolve the dispute.

[7] This provision initially troubled me because it created the prospect of a child having to return support moneys to the

opportunity to recoup these funds. This consequence represents my only solace from the majority opinion since Tukker no longer has to return his support money to his father.

I would leave the family court's judgment intact. This case, like Tukker, is still in its infancy. Family court cases are fluid situations. Most of the concerns raised by Tommy are more properly addressed by any changes in the circumstances upon which the family court's judgment is premised. And, the family court has repeatedly expressed its willingness to exercise discretion on this front. For the moment, we should allow the mechanism of the family court's well-reasoned judgment to work. I respectfully dissent.

payor. However, the issue was not appealed by Mary nor by anyone on Tukker's behalf.