IN RE the PATERNITY OF TUKKER M.O.:

MARY L.O., Petitioner-Respondent-Petitioner,

v.

TOMMY R.B., Jr., Respondent-Appellant.

Supreme Court

*No. 93–1929. Oral argument October 31, 1995.—Decided February 15, 1996.*

(Also reported in 544 N.W.2d 417.)

For the petitioner-respondent-petitioner there was a brief by *Carl K. Buesing, Robert H. Halvorsen* and *Halvorsen, Buesing & Seymour, S.C.,* Sheboygan and oral argument by *Carl K. Buesing.*

For the respondent-appellant there was a brief by *James J. Podell, Carlton D. Stansbury* and *Law Offices of Podell & Podell,* Milwaukee and oral argument by *Carlton D. Stansbury.*

Amicus curiae brief was filed by *Sherwood K. Zink,* counsel, Madison for the Wisconsin Department of Health and Social Services.

ROLAND B. DAY, C.J.    This is a review of a published decision of the court of appeals, *Mary L.O. v. Tommy R.B., Jr.,* 189 Wis. 2d 440, 525 N.W.2d 793 (Ct. App. 1994), reversing in part and affirming in part a judgment of the circuit court for Sheboygan County, John B. Murphy, Judge, that ordered Tommy R.B., Jr. (Tommy) to pay seventeen percent of his income as child support and creating a trust for a portion of the child support payments. This case presents two issues. First, whether a family court in a paternity action may award child support according to the percentage standards in order to assure payment throughout the child's minority when the payor currently has a high income, but may soon undergo a substantial loss of income; second, whether a family court may establish a

trust for a child's post-minority educational expenses from funds paid for child support. We answer both questions in the affirmative and reverse in part the decision of the court of appeals.

Mary L.O. (Mary) was a twenty-two-year-old college student in August 1990 when she met and spent an evening with Tommy. Mary gave birth to a child, Tukker M.O. (Tukker) in May of 1991, and named Tommy as the child's father. Tommy admitted paternity. Mary and Tommy have never lived together as a family, and Tommy had never seen Tukker as of the time of the trial court proceedings in this case.

Tommy has been a punter in the National Football League (NFL) since 1987, and as of the February 1993 court proceedings had played on the same team since 1989. His income has ranged from approximately $70,000 in 1989 to approximately $430,000 at the time of the family court proceedings to determine child support for Tukker in February, 1993. At the time of the proceedings, Tommy was not under contract to a football team, although he testified that his performance during the previous year made him confident that he would be playing during the following season. Tommy's financial advisor testified that the average career of an NFL punter is 4.03 years. The advisor also testified that he was not aware of any other skills or abilities on Tommy's part that would allow him to find employment other than as a football player. Tommy has a four-year college degree in business. Before becoming a punter, he worked as a shoe salesman.

Under Wis. Stat. § 767.51(4m) (1993-94),[1] a family court shall determine the amount of child support payments according to percentage standards established

---

[1] Section 767.51(4m) provides:

by the Department of Health and Human Services (DHSS). In this case, the applicable percentage was seventeen. *See* Wis. Admin. Code § HSS 80.03(1)(a) (June 1994). Tommy asked the family court to deviate from this amount, as allowed under Wis. Stat. § 767.51(5) (1993-94).[2] Tommy argued that applying the seventeen percent standard in this case would result in an award much greater than required to support Tukker. Mary expressed concern that Tommy's career as a special-teams player might suddenly end, and he would thus be unable to meet his child support obligations due to a substantially lower income.

> The family court stated:
> [I]f we have, as the evidence clearly did demonstrate, . . . an earner, a payor, whose income stream, as it stands, is short-lived. . . . [I]t's an important idea. Because it shows us that we really do have to take some steps to capitalize on what he's got for right now and in the future hope that he works, but if he doesn't, insure that his child is well cared for.

The family court then determined that applying the seventeen percent standard was not unfair, discussing each of the factors listed in Wis. Stat. § 767.51(5). Mary had acknowledged that her current child support needs were $1500 per month. The court awarded child sup-

---

Except as provided in sub. (5), the court shall determine child support payments by using the percentage standard established by the department of health and social services under s. 46.25(9).

[2] Section 767.51(5) provides:

Upon request by a party, the court may modify the amount of child support payments determined under sub. (4m) if, after considering the following factors, the court finds by the greater weight of the credible evidence that use of the percentage standard is unfair to the child or to the requesting party:

. . . .

port in the amount of $1500 per month to be paid to Mary. The remaining portion of the seventeen percent was to be placed in a trust fund. The family court stated its purpose in creating the trust fund as follows: "[T]o provide the cash flow for the support of [Tukker], a minor, over the period of time to meet the statutory criteria of child support and to meet the post-minority responsibilities of going off to college."

The trust fund, as established by the family court, has two components. The first component is a liquid "discretionary fund" with a continuously maintained balance of $20,000. Mary can obtain money from this fund without prior approval from Tommy "for child support when the $1500 per month is not immediately forthcoming from the payor and for reasonable costs of [Tukker's] minority education." Each year, Tommy has a right to review distributions from the fund.

The second component of the trust, funded from the remaining monies, is to be invested in "highly-secured, high-yield, and long-term types of securities." Upon their mutual agreement, Mary and Tommy may make withdrawals from this component of the trust for "big expenses, for college tuition, etc." If Mary and Tommy do not agree, then withdrawal can occur by court order.

Both Tommy and Mary are cotrustees. Mary is to provide an annual accounting of the trust to Tommy. The family court "will review and examine the trust corpus on or about the Nineteenth (19th) birthday of [Tukker] to determine what, if anything, needs to be paid to bring the child support up to date and review what is necessary for the future educational needs of the child at that time." The family court judgment further provides: "The trust shall terminate in its entirety on and no later than the twenty-fifth (25th) birthday of

[Tukker] by order of the Court, or upon the earlier death of [Tukker]." Upon termination of the trust, the remaining monies in the trust, including both principal and interest, will revert back to Tommy.

Tommy appealed the circuit court's order. A two-to-one majority of the court of appeals affirmed in part and reversed in part. The majority of the court of appeals held that the circuit court had not erroneously exercised its discretion in creating a trust; however, the circuit court had erred in calculating child support based on the percentage standards and in providing for the educational needs of Tukker after he had reached the age of majority. *Mary L.O.*, 189 Wis. 2d at 443. Mary sought review.

The determination of appropriate child support is committed to the discretion of the family court. *Weidner v. W.G.N.*, 131 Wis. 2d 301, 315, 388 N.W.2d 615 (1986). An appellate court will sustain a discretionary act if it finds that the family court examined relevant facts, applied a proper standard of law, and, using a demonstrated rational process, reached a conclusion a reasonable judge could reach. *Id.* (citing *Loy v. Bunderson*, 107 Wis. 2d 400, 414-15, 320 N.W.2d 175 (1982)).

The first question is did the family court err in using the percentage standards to determine Tommy's child support obligation. The family court is required to determine child support according to the percentage standards, *see* Wis. Stat. § 767.51(4m), although the court may modify the award if it finds by the greater weight of the credible evidence that the use of the standards would be unfair to the child or the party requesting a modification, *see* Wis. Stat. § 767.51(5).

The court of appeals has considered the difficulties created by high-income payors in child support cases. The application of the percentage standards in such cases may produce incongruous results. In *Parrett v. Parrett*, 146 Wis. 2d 830, 432 N.W.2d 664 (Ct. App.), *review denied*, 147 Wis. 2d 888 (1988), a business owner with a gross income of approximately $16,500 per month and his spouse were divorced. The family court concluded that the use of the percentage standards would "result in a figure so far beyond the child's needs as to be irrational" and instead set child support payments at $1000 per month. *Id.* at 837. The court of appeals upheld the trial court's judgment, holding "[i]t is reasonable to refuse to apply guidelines based on statistical generalities when the facts before the court bear little relationship to a statistical norm." *Id.* at 842.

In *Hubert v. Hubert*, 159 Wis. 2d 803, 465 N.W.2d 252 (Ct. App. 1990), a cardiac surgeon with an annual income of over $1,000,000 and his wife were divorced. The wife asked that child support payments for the couple's two children be determined according to the percentage standards, i.e., twenty-five percent of the husband's income, or approximately $20,000 per month. *Id.* at 813. The trial court found that applying the percentage standard would be unfair to the husband, and instead set child support payments at $4000 per month. *Id.*

The court of appeals reversed. The court of appeals first noted that *Parrett* did allow a court to deviate from the percentage standards when the payor's high income would result in unnecessarily high payments: "We agree that in cases where the parties have a substantial marital estate and income far beyond the average income of most people, the robotistic utilization of the percentage standards may give absurd

results." *Id.* at 814. Nonetheless, the court of appeals concluded that the family court had failed to consider several factors weighing against deviation, including the best interests of the children and the children's educational needs. *Id.* at 815. In ruling that the percentage standards would result in an absurdly high child support award, the family court had not considered that the children would have enjoyed an extremely high standard of living had the marriage continued: "The family court erred when it failed to articulate why the children should not be supported 'at the economic level they would have enjoyed had there been no divorce.' " *Id.* at 816.

In the present case, the family court considered the factors listed under § 767.51(5) in making its determination that imposing the seventeen percent standard would not be unfair to Tommy. The court discussed each factor individually and at length. The court thus addressed Tukker's needs; the physical, mental, and emotional health needs of Tukker's parents; the relative financial means of the parents; the earning capacity of each parent, based on each parent's education, training, and work experience; the need and capacity of Tukker for education, including higher education; Tukker's age; Tukker's financial resources and earning capacity; the custody arrangement; extraordinary travel expenses; the responsibility of Tukker's parents for the support of others; the value of services contributed by Tukker's mother, as the custodial parent; Tukker's best interests; and any other factors the court found relevant to Tukker's best interests. *See* Wis. Stat. § 767.51(5)(a)-(j).

The court's discussion of these fourteen factors spans thirteen pages of the trial transcript. Among its determinations, the court found that Tommy was able

195

to pay seventeen percent of his income for child support without hardship. The court observed, however, that this situation would not last: "[Tommy's] future as a special teams player has limitations, and probably in the near future, he won't be doing that any more." The court had heard testimony showing that Tommy had already had a longer-than-average career as a punter, and that he did not have a contract as of the time of trial. The court had expressed its concern that Tommy would not be able to meet his child support obligation in the future, and stated "it shows us that we really do have to take some steps to capitalize on what he's got for right now and in the future hope that he works, but if he doesn't, insure that his child is well cared for." Thus the court concluded that applying the percentage standards was not unfair in this case.

Judge Nettesheim, dissenting to the court of appeals opinion in the instant case, described the family court's decision as "a textbook example of a proper exercise of judicial discretion." *Mary L.O.*, 189 Wis. 2d at 466 (Nettesheim, J., dissenting). We agree. The family court reached a reasoned conclusion that the use of the percentage standards in this case would not be unfair to Tommy. The use of the percentage standards was not "robotistic." *See Hubert*, 159 Wis. 2d at 814. Rather, the court considered all applicable factors and made a "wise, prudent and creative" determination that the percentage standards should still apply in this case because, unlike the high-income payor in *Hubert*, Tommy's income may suddenly and drastically change, and he ultimately may not be able to satisfy his child support obligation. *See Mary L.O.*, 189 Wis. 2d at 468, 469 (Nettesheim, J., dissenting).

Judge Nettesheim also observed that the base support award of $1500 per month, which Tommy did not contest on appeal, would result in direct payments to Mary of $324,000 during Tukker's minority. *Id.* at 467. If, however, Tommy's career as a punter should end after another two years, he would only have paid $136,000 in child support—assuming he keeps his present salary of $400,000 per year. Should Tommy find work or have an investment income of $50,000 per year thereafter, he would pay $8500 each year under the seventeen percent standard, resulting in another $136,000 of total payments. The end result, as Judge Nettesheim noted, would be a total of $272,000 in child support payments, or $52,000 less than Tukker's needs as determined by the family court. *Id.* at 468. Finally, we also agree with Judge Nettesheim's observation that Tommy can always seek modification of the family court's support order if Tommy's future income does not conform to the projections made by the family court. *Id.* at 469.

The majority of the court of appeals, however, expressed concern that the family court's order misused the percentage standards by applying the standards to determine Tukker's future needs, that is, to "generate money for future support." *Id.* at 449. The majority explicitly acknowledged that a family court may set aside money for the future support of the child when the money is available at the present time but may not be available later. *See id.* at 451. The majority also concluded that Wis. Stat. § 767.475(7) and 767.51(3) (1993-94),[3] allow the family court in a pater-

---

[3] Section 767.475(7) provides that, in paternity actions, "[t]he court may appoint a trustee or guardian to receive and manage money paid for the support of a minor child." Section

nity action to use a trust to accomplish this goal. *Mary L.O.*, 189 Wis. 2d at 450. We agree with that portion of the court of appeals opinion.

■

However, the majority's disagreement with the trial court was its use of the percentage standards to accomplish its goal. The majority read *Weidner*, 131 Wis. 2d at 318, as requiring the percentage standards to be employed only to measure present needs of the child. The court in *Weidner* stated that the percentage standards are an "evidentiary shortcut for establishing the need of the child for support," and that the standards determine the percentage of a parent's income and assets that he or she shares with children in his or her custody. *Id.* at 318. The majority in *Mary L.O.* also referred to an article, Jacques van der Gaag, *On Measuring the Cost of Children*, 4 CHILDREN & YOUTH SERVS. REV. 77 (1982), on which DHSS based its choice of a percentage standard:

> The majority has read and reread the primary work which culminated in the enactment of the percentage standards by the legislature. . . . The majority reads this work to say that the percentage standards compute the bundle of consumer goods needed for present support only. The dissent believes, however, that because the percentage standards presume a higher standard of living commensurate with higher income, the higher-income payee is entitled to left over dollars, over and above present support, because that is the way of high-income families.

767.51(3) provides that the judgment or order in a paternity action may include "any other provision directed against the appropriate party . . . concerning the duty of support . . . ."

*Mary L.O.*, 189 Wis. 2d at 447. We agree with the dissent that the percentage standards, as applied in this case, may be used to fund future support. As we have already noted, the family court here did not simply apply the percentage standard unthinkingly, but instead determined that the percentage standard was still appropriate after its consideration of the various factors listed under § 767.51(5). The family court concluded that Tukker's best interests would be served by Tommy paying child support according to the percentage, because the funds might not be available later. The judgment or order of the family court in a paternity action must serve the best interests of the child. *See* Wis. Stat. § 767.51(3) (1993-94); *Weidner*, 131 Wis. 2d at 317. We find that the application of the percentage standard in this case was within the family court's discretion to fashion an order serving Tukker's best interests.

■ Furthermore, we do not find the distinction between present and future support in our child support law that the court of appeals majority does. A child support order, as Judge Nettesheim observes, always "reaches into the future." *Mary L.O.*, 189 Wis. 2d at 470. Every child support order is premised on present needs, but extends into the future because it anticipates future needs and continues until a change in circumstances requires a modification in the order. The description of the percentage standards in *Weidner*, 131 Wis. 2d at 318, on which the majority relies, is inapposite. The court in *Weidner* was simply noting that the percentage standards serve as a shortcut to establishing the need for support, not that a court must look only to the present need for support. The court of appeals thus erroneously concluded that the percent-

age standards must be strictly limited to the calculation of present support.

Next is the question, did the family court err in establishing a trust for Tukker's child support payments in excess of $1500 each month.[4] The court of appeals held that the creation of the trust was an erroneous exercise of discretion because it would compel Tommy to pay support for Tukker after the age of majority. *See Mary L.O.*, 189 Wis. 2d at 453 (citing *Bliwas v. Bliwas*, 47 Wis. 2d 635, 638, 178 N.W.2d 35 (1970); *Resong v. Vier*, 157 Wis. 2d 382, 391, 459 N.W.2d 591 (Ct. App. 1990)).

We conclude that the trust is permissible under Wis. Stat. § 767.51(5)(e) (1993-94). This section, which allows the family court in a paternity action to consider the "need and capacity of the child for education, including higher education," supports the actions of the family court in the present matter. After directing the family court to look to a child's need and capacity for higher education in setting support, which the family court in the present matter properly did, the legislature must mean to permit courts to undertake efforts in appropriate circumstances to see that a child's capacity for higher education is served by making preparations, including financial preparations, for attendance at an institution of higher learning. A trust is a logical and feasible device to accomplish this end.

---

[4] We reach this issue despite Mary's argument that Tommy waived any challenge to a post-majority trust by including a trust to fund Tukker's post-secondary education in his proposals for settlement during the trial. As did the court of appeals majority, we conclude that Tommy's proposals were not a concession of the family court's authority to create such a trust, but rather a model on which to base settlement negotiations. *See Mary L.O.*, 189 Wis. 2d at 453 n.5.

■

We note that, so as not to conflict with *Bliwas*, any payments to a trust must be made from child support payments paid while the child is still a minor. The family court's order in this case requires exactly that. We conclude that the family court in this paternity action acted within its discretion and within Wis. Stat. § 767.51(5)(e) in its creation of a trust in which some portion of the payments (assuming that the potential shortfall in funds which we have already noted does not come to pass) may go towards Tukker's higher education.[5] We therefore reverse the portion of the court of appeals decision disallowing the trust for Tukker's child support payments in excess of $1500 per month.

■

The court of appeals majority also found that the family court erroneously exercised its discretion in creating the "discretionary fund" component of the trust. The court of appeals stated:

> Creation of a "discretionary fund" that authorizes different investment options than the trust, allows withdrawal from the fund by the custodial parent at the expense of the trust without cotrustee

---

[5] We note there is an apparent discrepancy between paternity and divorce actions in the factors a court must consider when setting child support. In divorce actions, the court is to consider "[t]he child's educational needs," *see* Wis. Stat. § 767.25 (1m)(g) (1993-94), whereas in paternity actions the court is to consider "[t]he need and capacity of the child for education, including higher education," *see* Wis. Stat. § 767.51(5)(e). This difference has existed since 1979, when the legislature changed the paternity statute to its present wording. *See* § 25, ch. 352, Laws of 1979. We direct the legislature's attention to this discrepancy. We do not attempt to resolve the discrepancy in this case because the issue is not before the court.

approval, and has different notice and review provisions than the trust effectively creates two separate entities—a trust and a fund. As we see it, the trial court may impose a trust, but may not thereafter impose a fund that has separate components than the trust.

*Mary L.O.*, 189 Wis. 2d at 460 (footnote omitted). The majority held that the language of Wis. Stat. § 767.25(2) (1993-94)[6] allows the creation of a "separate fund or trust," but not both. *Id.* at 460 n.8. We do not agree with this reading of § 767.25(2). First, this section does not apply to paternity actions. Second, we see no reason why a family court in a paternity action may not structure a trust in any manner serving the best interests of the child, including the creation of a trust with a separate fund component. We therefore also reverse this portion of the court of appeals decision.

In conclusion, we hold that the family court in the present matter did not abuse its discretion in its determination not to deviate from the percentage standards in awarding child support, and in creating a trust for future support and possible higher education expenses. We reverse those portions of the decision of the court of appeals which reversed the circuit court's judgment. We affirm that portion of the court of appeals decision which affirmed the circuit court's judgment.

*By the Court.*—The decision of the court of appeals is affirmed in part and reversed in part and the cause

---

[6] Section 767.25(2) provides: "The court may protect and promote the best interests of the minor children by setting aside a portion of the child support which either party is ordered to pay in a separate fund or trust for the support, education, and welfare of such children."

remanded for further proceedings not inconsistent with this opinion.