IN RE the MARRIAGE OF:

Paul D. NELSEN, Petitioner-Respondent-Cross Appellant,

v.

Susan Nelsen CANDEE, Respondent-Appellant-Cross Respondent.

Court of Appeals

*No. 95–2208. Submitted on briefs September 3, 1996.—Decided October 23, 1996.*

(Also reported in 556 N.W.2d 784.)

On behalf of the respondent-appellant-cross respondent, the cause was submitted on the brief of *Henry H. Conti* of Waupun.

On behalf of the petitioner-respondent-cross appellant, the cause was submitted on the brief of *Peter John Hoeper* of Waupun.

On behalf of the guardian ad litem, the cause was submitted on the brief of *Arik J. Guenther* of Campbellsport.

Before Anderson, P.J., Brown and Nettesheim, JJ.

BROWN, J.   The most interesting aspect of this divorce case relates to how the family court treated Susan Nelsen Candee's motion to increase child support to the level prescribed by DHSS guidelines. The family court rejected her request, reasoning that the support award must reflect the postmarriage history, including Susan's earlier agreement not to apply the guidelines and her failure to fulfill her original plan of completing her degree and working outside the home. We conclude that the family court's decision to set aside the guidelines based on its findings regarding Susan's lifestyle choices was within its discretion. We likewise affirm its decision to deny Susan's request for an award to pay her attorney's and the children's guardian ad litem fees. We also reject Paul D. Nelsen's cross-appeal concerning the family

court's decision not to modify his and Susan's custody arrangements.

## Case History

Since the history of Susan and Paul's postmarriage relationship underlies the family court's findings, we will detail it at some length. After outlining this history, we will address seriatim each of their respective appellate claims.

Susan and Paul divorced in February 1990 after a four and one-half year marriage. They had two children; Emily is now ten and Arthur is now eight.

When they divorced, Susan and Paul entered into a marital settlement agreement which was approved by the family court. In it, Susan and Paul set out the financial terms for their postmarriage relationship. They agreed to set support at a fixed sum of $1250 per month; this sum was based on Paul's anticipated gross income fixed to a maximum of $60,000 per year. At that time, Paul was (and continues to be) a practicing physician with an income that would have seemingly called for a higher child support award under the guidelines. The financial disclosure records from February 1990 list his gross monthly income at $7360. *See* WIS. ADM. CODE § HSS 80.03. Therefore, by agreeing to calculate support in this manner, the parties implicitly rejected the DHSS guideline methodology.

Paul also agreed to make "Section 71" payments of $750 per month until January 1994. These payments were intended to offset Susan's educational costs and help her prepare for a career.[1] Paul also agreed to make two $5000 payments to account for the division of

---

[1] Paul writes in his brief that:

martial property. The agreement also spelled out how Paul and Susan would split their personal property.

The marital settlement addressed custody issues as well. At the time, Susan and Paul were living in Wisconsin and agreed to joint custody of Emily and Arthur. The agreement also set out the basic terms of visitation.

Over the next three years, however, the parties engaged in what the family court termed "bickering." The disputes began with Paul's claim that Susan failed to return some of his personal property and Susan's allegation that child support payments were late.

A much more significant dispute arose in March 1992 when Paul learned that Susan had taken the children to Boulder, Colorado and received notice that she wished to permanently locate the children there. Susan wanted to live near her fiance and she wished to participate in a special program at the University of Colorado.

Paul filed his formal objection to the move and the family court ordered them to enter mediation. The family court also appointed a GAL. In September 1992, the family court endorsed the "Parenting Plan" that

[T]he agreement provided that [he] would pay $2,000 per month to [Susan] until January 15, 1994. These payments were intended to permit [Susan] to obtain employment after Arthur started school.

He has not, however, provided us with a record citation to support this statement. Our independent review of the agreement reveals, moreover, that each $2000 payment was composed of $1250 for child support and $750 for "Section 71" payments. This analysis is confirmed by Fond du Lac County records, which list total monthly payments from Paul to Susan of $2000 and label $1250 as "Support" and $750 as "Alimony." We acknowledge that annual payments totaling $9000 for three years is nonetheless a significant contribution to Susan's educational goals.

was developed through mediation. This plan permitted Susan to locate the children in Colorado, although the children would stay in Wisconsin with Paul during the summer and some holidays.

The following year, in September 1993, Paul filed a motion to modify the plan and other custody arrangements. He alleged that Susan had not met some of the plan's terms, had violated other court orders, and that his current child support payment did not account for the additional expenses associated with transporting the children to and from Colorado. He asked that the court grant him sole custody or, alternatively, that the primary placement of the children be changed to his home in Ripon. In October, Paul filed a supplemental affidavit complaining of a visit to Colorado. When he got there, Susan refused to let him have contact with Emily or Arthur.

Paul's motion to change placement was first referred to the family court commissioner. It determined that Susan had made "direct and willing violations" of the plan and that Paul had established a basis for reconsidering the current custody arrangements. The commissioner ordered the county's family services officials to complete a new custody assessment.

During the information-gathering stage, Susan moved for a temporary, upward adjustment from the current $1250 per month child support award. Owing to her increased expenses, she requested that child support be determined in accordance with the statutory guidelines. She also requested immediate funds to offset her accumulating legal fees.

While the family court agreed to a temporary increase in child support, it did not apply the guidelines. Instead, it calculated that an appropriate

adjustment would be an increase from $1250 to $1900. The court denied any release of funds for attorney's fees.

The family court subsequently held hearings to address the custody and child support matters in November 1994. The court issued its final order in May 1995, reaching the following conclusions. With regard to child support, it again rejected Susan's demand to apply the statutory guidelines and affirmed its interim adjustment to $1900 per month. It also denied Susan's request for an award to pay her attorney and her half of the GAL expenses. On the matter of Paul's custody challenge, the court accepted the county assessment team's recommendation that the children be permitted to stay with Susan in Colorado. We will now turn to Susan's and Paul's respective challenges to this order.

### CHILD SUPPORT

The family court resolved the child support issue by essentially affirming its prior temporary order and making the increased monthly payment of $1900 a permanent obligation. In reaching this conclusion, the family court denied Susan's request to apply the statutory guidelines, which would have yielded about $2800 per month.

The family court rested its decision on its analysis of the postmarriage relationship shared by Susan and Paul. The court noted that Paul had made all of his "Section 71" payments, which should have given Susan "ample time" to start her career and earn the funds necessary to support her desired lifestyle. While the family court acknowledged that Paul had a high income, which suggests that his children should have a share of his wealth, it found that the $1900 monthly payment was "sufficient" to support the children. The

family court, in fact, noted that Paul's payments were more than what ninety percent of other divorced mothers and fathers in its jurisdiction were paying.

Based on these factors, the family court reached its ultimate conclusion that any amount above $1900 was unnecessary to support the children's needs and would "assuredly be maintenance in the guise of support." Moreover, recognizing that Paul had to pay for transporting the children to and from Colorado to facilitate Susan's decision to relocate there, the family court credited him with a $400 reduction in the monthly award during the summer months when the children were to be with him.

On appeal, Susan generally claims that the family court misused its discretionary authority to set child support awards. *See Molstad v. Molstad,* 193 Wis. 2d 602, 606, 535 N.W.2d 63, 64 (Ct. App. 1995). She believes that the family court erred because it departed from the statutory guidelines without properly considering all of the factors prescribed under § 767.25(1)(m), STATS.

Turning to Susan's specific arguments, she first asserts that the family court placed too much weight on what it perceived as her lack of diligence in pursuing a career. In doing so, Susan alleges that the court failed to consider that increased support would give Emily and Arthur the benefit of having her stay at home. *See* § 767.25(1m)(d), STATS. Whatever the family court's views were regarding her current job situation, Susan contends that the actual effect of its decision to step outside the guidelines is to "punish[ ] Emily and Arthur by depriving them of the child support that is due them."

We disagree with Susan's view that the family court must always give great weight to having the primary custodian stay at home and her general characterization of the family court's decision-making process. The family court has discretionary authority to set aside the guideline percentages when it finds that the use of the standard "is unfair to the child or to any of the parties." *See* § 767.25(1m), STATS.; *see also Luciani v. Montemurro-Luciani*, 199 Wis. 2d 280, 295, 544 N.W.2d 561, 567 (1996). When this court reviews such decisions, we determine if the court examined the relevant facts, applied the correct standards and reached a rational decision. *See id.* at 294, 544 N.W.2d at 566.

The family court rested its decision to depart from the guidelines on the following findings. It determined that Susan's move to Colorado "greatly exacerbated the situation." And while the family court found that the parties had previously agreed to depart from the standards, it also found that some upward adjustment was necessary to account for the children's increased needs and fairness between Susan and Paul.

Significantly, the family court also found that Susan's current earnings were not high enough to support herself. Emphasizing this conclusion, Susan believes that the family court could only attribute her low income to her choice to stay at home and devote herself to the children. Indeed, we agree that such a finding, standing alone, could rationally support a conclusion that Paul needs to make more of a contribution (at least equivalent to the guideline amount) to offset how such a choice would negatively affect her ability to independently generate resources. *See* § 767.25(1m)(b), STATS.

But the family court did not see things this way. Instead, it recalled the history of the relationship between the parties, especially the parties' earlier agreement that Paul would make "Section 71" payments to help Susan establish her career. In light of this history, the family court was suspicious of Susan's current desire to be a stay-at-home mother. It thus determined that Susan's claim for extra child support was really a disguised claim for extra money to support her lifestyle without having to return to the workplace. Because this conclusion was within the range of possible outcomes that the record could support and because the decision also involves the trial court's assessment of Susan's credibility, we cannot say that the family court misused its discretion by making it.

Susan next contends that the family court's finding that Paul was paying more in monthly support than ninety percent of the other mothers and fathers in its jurisdiction is a separate signal that the court misused its discretion. According to Susan, the family court's conclusion that Paul was within the top percentile of this pool was not a proper ground for deviating from the percentage standard.

When the family court made this observation, it relied on *Parrett v. Parrett*, 146 Wis. 2d 830, 842, 432 N.W.2d 664, 669 (Ct. App. 1988), which cautions against applying the guidelines when the facts of the case bear little relationship to the statewide statistical norm that the guidelines attempt to capture. However, we agree with Susan that *Hubert v. Hubert*, 159 Wis. 2d 803, 465 N.W.2d 252 (Ct. App. 1990), also has a role in this case. There, we set out a corollary to *Parrett* and held that even when the guideline-based amount seems large on its face, the large award may be

appropriate to maintain a child in a predivorce lifestyle. *See Hubert,* 159 Wis. 2d at 815-16, 465 N.W.2d at 256-57; *see also Mary L.O. v. Tommy R.B.,* 199 Wis. 2d 186, 194-95, 544 N.W.2d 417, 420 (1996) (discussing *Parrett* and *Hubert*). Nonetheless, we conclude that the family court's calculation of an appropriate award accounts for the *Parrett* rule and the *Hubert* corollary.

Because Paul is a high-income payor, the *Parrett* rule informs us that the guideline amount may be more than what the children actually need. But because Emily and Arthur are the children of a high-income physician, the *Hubert* corollary suggests that Paul's child support payments should be high so that the children continue to enjoy the lifestyle that they had before he and Susan divorced. The issue left for the family court, therefore, was to set an award within these guideposts.

■

Although Susan argued to the family court that "the children are living at a substantially lower level than they would have had the marriage remained intact," the court had to balance this allegation against other possibilities. Based on the history of Paul and Susan's postmarriage relationship, the court was properly concerned that child support payments set at the statutory guidelines would be more than what Susan claimed Emily and Arthur needed. If the amount the family court set was too much, Paul would in effect be supporting Susan with the unused portion. We thus conclude that the family court properly exercised its discretion when it set an amount of child support at a high level (measured by what other people in the community were paying), but was not too much

such that Paul would be supporting Susan with the leftovers.

Last, we address Susan's complaint that the family court did not fulfill its duty to investigate the earning capacity of each parent before shaping an appropriate award. *See* § 767.25(1m)(b), STATS. Here, Susan cites specific monthly expense items within Paul's financial disclosure, such as $1000 for transportation, $325 for auto expenses and $401 for auto payments, and argues that the family court's "unquestioned adoption and acceptance of Paul's financial disclosure statement alone supports a ruling from the Court of Appeals that the Trial Court abused its discretion."

We disagree. Contrary to Susan's suggestion, the family court is not required to place on the record its opinion regarding every line item in a financial disclosure statement when making a determination regarding the financial resources of a parent. Provided that the family court had evidence that the parties made full disclosure, we may assume that the family court correctly considered such evidence. *See Abitz v. Abitz*, 155 Wis. 2d 161, 175-76 n.6, 455 N.W.2d 609, 615 (1990).

### SUSAN'S ATTORNEY AND GAL FEES

The family court denied Susan's motion for an award of attorney's fees incurred in defending the challenge to the custody arrangements. The court likewise denied her request that Paul offset her half of the GAL fees. Susan contends that the family court misused its discretion in reaching these determinations. *See generally Van Offeren v. Van Offeren*, 173 Wis. 2d 482, 499, 496 N.W.2d 660, 666 (Ct.

App. 1992). We disagree and affirm its judgment on these matters.

The family court's decision reveals that it considered the respective financial circumstances of Paul and Susan and acknowledged that Susan was in need and that Paul had an ability to pay. Nonetheless, the family court set aside these factors and again chose to look instead at the history of the case. Based on this history, it determined that the overly litigious conduct of each party warranted that each party bear the weight of its respective expenses. Moreover, the court separately expressed its concern that Susan's current financial difficulties stemmed from her conscious decision not to make the most of her education.

On appeal, Susan suggests that the family court's decision to set aside the traditional standards of need and ability to pay reflects the "Court's bias against custodial parents who do not gain significant income from work outside the home" and was a misuse of discretion.

We acknowledge that dispassionate concerns over each party's financial needs and each party's ability to satisfy those needs traditionally drive the analysis of whether to assign awards covering attorney's fees and GAL expenses. *See* § 767.262(1)(a), STATS.; *Van Offeren,* 173 Wis. 2d at 499-500, 496 N.W.2d at 666.[2] In this case, however, the family court saw another concern.

By the time it made this ruling, the family court had served as the arbitrator between Paul and Susan for over five years. And during this period, the family

---

[2] The reasonableness of the fees is also a factor in this analysis. *See Selchert v. Selchert,* 90 Wis. 2d 1, 16, 280 N.W.2d 293, 300 (Ct. App. 1979). Nonetheless, the court found that the fees were reasonable and this finding is not challenged on review.

court had warned Paul and Susan about their "bickering" and that their litigiousness would reach a point where awards of attorney's fees would no longer be fair. The family court's decision not to award Susan her fees reveals that it finally reached that point.

■ We further conclude that the family court's reliance on the past case history is analogous to the power that the family court has to sanction one party for engaging in "overtrial." *See Ondrasek v. Ondrasek,* 126 Wis. 2d 469, 484, 377 N.W.2d 190, 196 (Ct. App. 1985). Susan's current financial position and Paul's ability to pay undoubtedly present legitimate grounds for ordering that Paul cover Susan's attorney's fees. Nonetheless, the court here determined that Susan's need to retain an attorney stemmed from her desire to litigate issues with her former husband, instead of striving for compromise. Thus, the family court made her pay the fees, just as a party guilty of "overtrial" would be unexpectedly forced to pay the fees of the opposing party. *See id.*

We also reject Susan's claim that the family court was biased against her because she had failed to pursue a career. When the family court made its finding that Susan voluntarily placed herself in a position where she was unable to pay her fees, it was doing no more than we implicitly authorized a family court to do in *Van Offeren,* 173 Wis. 2d at 496, 496 N.W.2d at 665. In *Van Offeren,* we held that the family court may consider the "reasonableness" of a divorced person's lifestyle choices when assessing that person's current financial situation. *See id.* Applying this principle, the family court found that Susan's current inability to pay was directly attributable to her lack of diligence in pursuing a career. *See id.* at 492, 496

N.W.2d at 663 (noting that the family court should consider "earning capacity" rather than "actual earnings" when setting maintenance and support obligations). We hold that the family court could rely on its finding regarding the cause of Susan's current financial needs.

### CROSS-APPEAL OF CUSTODY DETERMINATION

As we explained above, in January 1994, the family court responded to Paul's motion to modify custody arrangements by ordering that the county's assessment team conduct another evaluation. The family court held hearings the following November and, in May 1995, entered an order adopting the team's recommendations.

The redeveloped parenting plan continues to grant Paul and Susan joint custody of their children as the original order of divorce specified. Although Susan has now relocated the children to Colorado, and this move is a major factor contributing to the breakdown in Paul and Susan's efforts at joint-parenting, the assessment team nonetheless determined that the children should continue to be primarily placed with Susan during the school year and that Paul should have primary placement during the summer.

On appeal, Paul contends that the family court misused its discretionary authority over custody matters. *See generally Licary v. Licary*, 168 Wis. 2d 686, 692, 484 N.W.2d 371, 374 (Ct. App. 1992). While he raises three specific contentions, they can be synthesized into a general claim that the family court failed to give proper weight to its earlier finding that Susan violated their custody agreement in October 1993 by refusing to permit Paul to see the children. He argues, in essence, that Susan's violation of their

earlier custody agreement automatically warrants changing primary placement to him. We disagree and affirm the family court's decision.

Paul's appellate claim rests heavily on this court's decision in *Pamperin v. Pamperin*, 112 Wis. 2d 70, 331 N.W.2d 648 (Ct. App. 1983). There, the parents were similarly sharing custody and were subject to a court order when the mother violated the agreement by taking the daughter to Mississippi so that they could be with her new husband. The father argued to the family court that this unauthorized move was sufficient grounds for modifying the court's previous judgment and transferring custody to him alone. *See id.* at 72-73, 331 N.W.2d at 649-50. The family court agreed with the father and we affirmed. *See id.* at 82, 331 N.W.2d at 654. Paul thus believes that *Pamperin* establishes a per se rule that a modification of custody is warranted whenever the family court finds that a parent has violated court-ordered arrangements.

■

Nonetheless, Paul misconstrues *Pamperin*. That case only supports a rule that one parent's interference with the custody rights of another *may* be grounds for modifying an earlier judgment. Indeed, the *Pamperin* court canvassed all the evidence placed before the family court and emphasized how it supported a finding that the mother's actions had negative effects on the child. *See id.* at 75-81, 82, 331 N.W.2d at 651-54. Thus, the rule that *Pamperin* set out is that custodial interference, when it has a negative effect on the children, is proper grounds for modifying custody. *See id.* at 82, 331 N.W.2d at 654.

However, as the GAL emphasizes in its brief, Susan and Paul each possess "excellent parenting skills" and each has "unquestionable love for their

children." The problems they have are with each other. The GAL writes that Susan has her own plans for raising the children and those plans "do not include Paul." The GAL also notes that Paul is "extremely mistrustful of Susan" and that similar parenting problems would likely continue should the children be placed with Paul in Wisconsin. On balance, the GAL nonetheless contends that leaving the children with Susan, even though she is the "violator" in this case, is in the children's best interests because they desire to remain with their mother.

■

We see that the family court faced a dilemma that could be solved with a spectrum of remedies. Susan had already demonstrated reluctance to adhere to existing custody arrangements and may continue to frustrate Paul's visitation. But on the other side, the evidence before the court also showed that Paul would not likely embrace Susan should he be granted sole custody or even primary placement. Since the family court has five years of experience with these parties and enjoyed the benefit of a hearing in which it could personally observe the demeanor of the parties, we cannot say that it did not reach an appropriate decision when it refused to modify custody.[3]

*By the Court.*—Order affirmed.

■

[3] Paul suggests that 1995 Wis. Act 70 governing custody and removal of a child after divorce has a role in our analysis. This Act was published after the hearing date and we see nothing in the record which suggests that Paul ever argued before the family court that it applied to his motion to modify custody. We deem this issue waived.