In re the Paternity of Andrew Kowalski:

Connie Kowalski, n/k/a Connie Bassel, Petitioner-Respondent,

v.

Scott Obst, Respondent-Appellant.†

Court of Appeals

*No. 03–0573. Submitted on briefs July 14, 2003.— Decided September 17, 2003.*

2003 WI App 218

(Also reported in 671 N.W.2d 339.)

† Petition to review denied 12-16-03.

On behalf of the respondent-appellant, the cause was submitted on the brief of *Margaret W. Hickey* of *Becker & Hickey, S.C.* of Milwaukee.

On behalf of the petitioner-respondent, the cause was submitted on the brief of *George N. Kotsonis* of Milwaukee.

Before Anderson, P.J., Brown and Snyder, JJ.

¶ 1. BROWN, J. In this case, we are asked to consider whether changes in the statutory structure for child support mandate a different result in this case than in *Mary L.O. v. Tommy R.B.*, 199 Wis. 2d 186, 544 N.W.2d 417 (1996). There, our supreme court held that a trial court may establish a trust for a child's postminority educational expenses from funds paid for child support. *Id.* at 189–90. Here, Scott Obst appeals an order increasing his child support obligations from $1500 to $4000 per month with $500 per month to be placed into a trust for his son's benefit, which can be used to fund his son's higher education if any money remains in the trust at the time his son obtains majority. Scott contends that because Wis. Stat. § 767.51(5)(e) (1993–94), the child support statute cited in *Mary L.O.*, has been repealed, the trial court no longer has the authority to establish a trust from funds

paid for child support for the purpose of funding a child's postminority educational expenses. We hold that when the legislature repealed § 767.51(5)(e), it did not intend to alter the import of *Mary L.O.* and the trial court had the authority to establish a trust from child support paid during Scott's son's minority, some of which may be used to fund his son's higher education. We also conclude that the trial court did not erroneously exercise its discretion when it vacated the January 2001 order and increased the amount of child support. We affirm.

¶ 2. Scott and Connie Kowalski, n/k/a Connie Bassel, have one minor child, Andrew, born on May 21, 1991. Prior to this action, the parties had last modified the support agreement in January 2001, after a motion brought by the child support enforcement agency. On January 17, the date of the modification hearing, Scott filed a financial disclosure statement showing his base monthly income as $16,250. The financial disclosure statement also stated that Scott's bonus income would vary depending on company performance, "CAN BE –0– TO $7,700." Based upon Scott's financial disclosure statement, the parties entered into a stipulation establishing child support payments at $1500 per month and $250 per month in arrears. Both parties' counsel and the court confirmed that the child support agreement was based upon Scott's weekly income of $3750, not on bonus income. The court approved the parties' agreement, and set the child support at $1500 per month and $250 per month on the arrears.

¶ 3. After Scott moved for placement with Andrew and filed an action for joint custody on March 26, 2002, Connie moved to modify support on April 11, 2002. Connie alleged that Scott had failed to fully

disclose his income in 2001 and requested the court to set child support at seventeen percent of Scott's actual income.

¶ 4. Scott then filed another financial disclosure statement in which he listed his total monthly income as $25,854, an amount that represented his W-2 income only. At the modification hearing, Scott testified both that his weekly income was up to $4750, an amount based on the financial disclosure statement, and that he earned bonus income. On cross-examination, Scott was asked to produce his wage stub from the last pay period, which was June 2002. The wage stub indicated that his gross year-to-date income was $232,763, which Scott testified meant that he earned roughly $37,000 in monthly base income. The trial court noted that this would constitute about $8500 a week for the first 28 weeks of that year.

¶ 5. As for the bonus income, Scott testified that although he paid income tax on significant K-1 income that he receives because he owns eight percent of the company, he does not actually receive the K-1 amounts. Scott testified that his employer pays out only enough money for Scott to pay the income tax on the K-1 amounts.

¶ 6. Connie testified that she had no income and that her husband told her he makes between $40,000 and $50,000 annually as a carpenter. Connie testified that Andrew's activities had changed significantly since January 2001. Connie also testified that the amount of child support ordered in January 2001 was sufficient to cover Andrew's expenses.

¶ 7. The trial court found that until recently Scott had done everything to avoid financial responsibility under the judgment of paternity. The court concluded that Scott had an obligation to notify the court and

Connie of his change in income and his failure to do so was both unreasonable and unconscionable. The court found that in the January 2001 agreement Scott did not make a complete disclosure of his income or of his ownership interest in the company he works for and that this nondisclosure had been Scott's pattern in the past. According to the court, Scott's disclosed income was far different from his 2000 gross income and was significantly understated. The court found that had the court not required him to provide the 2002 pay stub, the court would not have had accurate income information.

¶ 8. The court stated it had no authority to modify the support retroactively. The court found that there was a change in circumstances due to the increase in Scott's income. The court found that Scott's income average was in excess of $425,000 per year and that given his June 2002 wage stub, his income would near $450,000 for 2002. Thus, the court found that Scott was a high-income earner. The court found that Scott's income was not likely to change in the future. The court found that there was no showing that Andrew's basic needs were not already being met. The court then concluded that pursuant to *Mary L.O.*, it had the authority to set aside money for Andrew's future. After an analysis of the factors listed in Wis. Stat. § 767.25(lm) (2001–02), the court deviated from the percentage standard and ordered Scott to pay $4000 in child support (ten percent of his gross income), $500 of which was to be placed in a trust in a custodial account with both parents as trustees. The court ordered that the trust funds were to be used for Andrew's health and education. If money remained in the trust past Andrew's minority, the court ordered that the money was to be made available for Andrew's higher education. Scott appeals.

¶ 9. Scott raises several issues regarding the child support award. Determination of appropriate child support is discretionary with the trial court. *Weidner v. W.G.N.*, 131 Wis. 2d 301, 315, 388 N.W.2d 615 (1986). An appellate court will sustain a discretionary act if it finds that the trial court examined the relevant facts, applied a proper standard of law and, using a demonstrated rational process, reached a conclusion that a reasonable judge could reach. *Id.* (citing *Loy v. Bunderson*, 107 Wis. 2d 400, 414–15, 320 N.W.2d 175 (1982)).

¶ 10. We begin our analysis with Scott's challenge to the creation of the trust. Scott submits that the trial court erred in concluding that *Mary L.O.* authorized it to set aside money for the future educational needs of Andrew. Scott contends that in *Mary L.O.*, the supreme court relied upon WIS. STAT. § 767.51(5)(e) (1993–94) to uphold the use of a trust for postminority education. He observes that the legislature has repealed § 767.51(5)(e) (1993–94), and argues that this mandates a different result than in *Mary L.O.* because WIS. STAT. § 767.25(1m) (2001–02), which lists the factors courts are now to consider in making child support determinations, states that the court may consider the child's "educational needs," whereas § 767.51(5)(e) (1993–94) expressly authorized the court to look at the child's "higher education[al]" needs.

¶ 11. In *Mary L.O.*, the child's father was a professional football player with an exceptionally high current income, but a limited career span expectancy. *Mary L.O.*, 199 Wis. 2d at 190. The trial court determined that the father's ability to continue to support his child, based on his education and prior work experience, was questionable. *Id.* at 195–96. In order to ensure an adequate cash flow "over the period of time to

meet the statutory criteria of child support and to meet the postminority responsibilities of going off to college," the court established a trust from funds paid for child support. *Id.* at 192. The father appealed, arguing that the trial court did not have the authority to create a trust to fund the child's education past the age of majority. *Id.* at 193. The court of appeals held that the creation of the trust was an erroneous exercise of discretion because it would compel the father to pay support for the child after the age of majority. *Id.* at 200.

¶ 12. The supreme court reversed, holding that the trust was permissible pursuant to Wis. Stat. § 767.51(5)(e) (1993–94), as long as the trust payments were made from child support paid while the child was still a minor. *Mary L.O.*, 199 Wis. 2d at 200–01. The court explained that § 767.51(5)(e) (1993–94) allowed the family court in a paternity action to consider the "need and capacity of the child for education, including higher education" and concluded that this supported the actions of the family court in that case. *Mary L.O.*, 199 Wis. 2d at 200. The court further reasoned:

> After directing the family court to look to a child's need and capacity for higher education in setting support, which the family court in the present matter properly did, the legislature must mean to permit courts to undertake efforts in appropriate circumstances to see that a child's capacity for higher education is served by making preparations, including financial preparations, for attendance at an institution of higher learning. A trust is a logical and feasible device to accomplish this end.

*Id.*

¶ 13. In reaching its conclusion, the supreme court noted the discrepancy between paternity and divorce actions in the factors a court must consider when setting child support:

> In divorce actions, the court is to consider "[t]he child's educational needs," *see* Wis. Stat. § 767.25(1m)(g) (1993–94), whereas in paternity actions the court is to consider "[t]he need and capacity of the child for education, including higher education," *see* Wis. Stat. § 767.51(5)(e). This difference has existed since 1979, when the legislature changed the paternity statute to its present wording. *See* § 25, ch. 352, Laws of 1979. We direct the legislature's attention to this discrepancy. We do not attempt to resolve the discrepancy in this case because the issue is not before the court.

*Mary L.O.*, 199 Wis. 2d at 201 n.5. In fact, several of the child support factors in paternity cases were different from the child support factors listed in WIS. STAT. § 767.25(1m) (1993–94) for marital cases. Christopher D. Walther, *Wisconsin's Custody, Placement, and Paternity Reform Legislation*, 73 WIS. LAW. 15, 48 (Apr. 2000). In order to harmonize marital and paternity law, the legislature eliminated the inconsistent paternity factors, including the factor formerly found in WIS. STAT. § 767.51(5)(e) (1993–94), "the need and capacity of the child for . . . higher education," and amended § 767.25(1) (2001–02) so that it now applies to both marital and paternity cases. Walther, *supra,* at 48. Section 767.25(1m)(g) (2001–02), which is one of the factors courts are to consider in making the child support determination both in paternity and marital cases, permits courts to assess "the child's educational needs."

¶ 14. We cannot assume, as Scott asks us to do, that when the legislature repealed the separate, redun-

dant language in the paternity statute it intended to overrule *Mary L.O.* First, and most importantly, the rationale underpinning the supreme court's decision in *Mary L.O.* remains valid despite the statutory changes. In *Mary L.O.*, the supreme court posited that because the percentage standards presume a higher standard of living commensurate with the payer's higher income, the child is entitled to the money over and above his or her needs and that the excess money in the trust can be used for his or her future educational needs. This would be in the child's best interests and put the child in the same position as if the child was in an intact high-income family; thus, accomplishing the goal of the child support statutes, including Wis. Stat. § 767.25 (2001–02). Second, the language in Wis. Stat. § 767.25(1m)(g) (2001–02) permitting courts to consider a child's "educational needs" is clearly broad enough to encompass the higher educational needs of the child. To conclude otherwise would be to severely limit the trial court's discretion, especially in a high income earner situation. Thus, we are convinced that the statutory changes have not altered the import of *Mary L.O.*

¶ 15. We also note that case law interpreting Wis. Stat. § 767.25 (2001–02), the statute that now governs child support determinations in the context of paternity actions, suggests that a trust may be established for a minor child's higher education costs. In *Hubert v. Hubert*, 159 Wis. 2d 803, 817, 465 N.W.2d 252 (Ct. App. 1990), we held that § 767.25(2) provides the trial court with the necessary authority to establish trusts for the postmajority needs of the children. Section 767.25(2) reads:

> The court may protect and promote the best inter-

409

ests of the minor children by setting aside a portion of the child support which either party is ordered to pay in a separate fund or trust for the support, education and welfare of such children.

We concluded that the statute "gives the court an attractive means of providing for the future educational needs of children with child support that is paid *while the children are under the age of majority.*" *Hubert*, 159 Wis. 2d at 817. For the foregoing reasons, we hold that the trial court had the authority to establish a trust for Andrew's higher educational needs with child support paid while he is under the age of majority.

¶ 16. Referencing the factual context of *Mary L.O.*, Scott also seems to argue that a trial court only has the authority to create a trust if the court finds that the high-income payer's ability to support the child in the future is questionable. However, we can find no language in *Mary L.O.* or WIS. STAT. § 767.25 (2001–02) so limiting the discretion of the trial court in creating a trust. As long as the trust is created from child support paid during the child's minority, the funds from the trust can be used for the higher education of the child. Here, the trial court determined that given Scott's high level of income, the expectation that children in high-income families will pursue higher education, and Andrew's best interests, a trust, created solely with child support paid during Andrew's minority, of which some portion may go towards Andrew's higher education, was appropriate. This determination is wholly within the trial court's province and was reasonable given the record before the court. Accordingly, we conclude that the trial court did not erroneously exercise its discretion when it ordered Scott to pay $500 of the child support into a trust for Andrew's benefit.

¶ 17. We now turn to Scott's final arguments. Scott contends that the trial court erroneously exercised its discretion by modifying his child support obligation. Scott obviously does not challenge the court's deviation from the percentage guidelines, but instead asserts that there is no basis for the court's decision to increase the child support to $4000 per month. Scott further submits that the trial court erred by not adhering to the parties' agreement in the January 2001 order to use his base income and not his bonuses in setting child support.

██

¶ 18. We disagree with Scott's assertion that the trial court *modified* the January 2001 order. Although the parties and the court spoke in terms of a modification, our review of the record demonstrates that the trial court actually vacated the January 2001 order based on Scott's continuous intentional and deliberate misrepresentation of his income and then issued a new order based on Scott's real income. We, therefore, analyze the case in that context.

██

¶ 19. A court may relieve a party of an order for the reasons stated in WIS. STAT. § 806.07(1), including for "[f]raud, misrepresentation, or other misconduct of an adverse party." Once the court has determined that grounds exist, its decision to grant relief is discretionary. *Mogged v. Mogged*, 233 Wis. 2d 90, 95, 607 N.W.2d 662 (Ct. App. 1999).

¶ 20. The trial court concluded that Scott had simply chosen not to fully and truthfully disclose his income both to Connie and the court prior to the January 2001 proceedings, that this withholding of information was consistent with his history of attempting to avoid his child support obligations, and that, as a

result, the January 2001 order was based on incomplete information. The record supports the trial court's determination. Scott did not disclose his K-1 income on the January 2001 financial disclosure statement. On his financial disclosure statement, Scott indicated that he earned $16,250 monthly and he had a bonus income anywhere from $0 to $7700 per month; however, Scott knew or should have known that he received $329,000 in the calendar year 2000 or $27,000 per month and had an average monthly bonus income of $11,232—a far cry from what Scott had disclosed as his income. Accordingly, we conclude the trial court properly exercised its discretion in vacating the January 2001 order.

¶ 21. After analyzing the factors in WIS. STAT. 767.25(lm) (2001–02), the trial court then deviated from the percentage guidelines and ordered Scott to pay $4000 per month, the equivalent of ten percent of his income. We emphasize that the establishment and revision of child support are committed to the discretion of the trial court. *See Edwards v. Edwards,* 97 Wis. 2d 111, 116, 293 N.W.2d 160 (1980). Indeed, we have often said that "[b]ecause the exercise of discretion is so essential to the trial court's functioning, we generally look for reasons to sustain discretionary decisions." *Schneller v. St. Mary's Hosp. Med. Ctr.,* 155 Wis. 2d 365, 374, 455 N.W.2d 250 (Ct. App. 1990), *aff'd,* 162 Wis. 2d 296, 470 N.W.2d 873 (1991). In reaching the amount of child support, the court considered Scott's substantial increased capacity to pay child support, Connie's income, Andrew's lack of financial resources, the transportation costs attendant to the placement order, Andrew's health care costs, the typical standard of living of children in high-income families, and Andrew's best interests. The court also noted that if Andrew lived

with Scott's family, he would have the benefit of Scott's high income. These are all appropriate considerations. Further, we note that because the original order was based on fraud and misrepresentation, the court need not have adhered to the parties prior agreement to rely solely on Scott's base income. Therefore, we conclude that the trial court properly exercised its discretion in setting the amount of child support.

*By the Court.*—Order affirmed.